# IN THE SUPREME COURT OF IOWA

No. 18–0567

Filed June 28, 2019

**LARRY R. HEDLUND,**

Appellant,

vs.

**STATE OF IOWA; K. BRIAN LONDON** Commissioner of the Iowa Department of Public Safety, Individually; **CHARIS M. PAULSON,** Director of Criminal Investigation, Individually; **GERARD F. MEYERS,** Assistant Director Division of Criminal Investigation, Individually; and **TERRY E. BRANSTAD,** Individually,

Appellees.

---

Appeal from the Iowa District Court for Polk County, David May, Judge.

Plaintiff appeals summary judgment dismissing all claims in an employment case. **AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

Thomas J. Duff and Elizabeth Flansburg of Duff Law Firm, P.L.C., West Des Moines, and Roxanne Barton Conlin of Roxanne Conlin & Associates, P.C., Des Moines, for appellant.

Thomas J. Miller, Attorney General, and Jeffrey C. Peterzalek and William Pearson, Assistant Attorneys General, for appellees.

**CHRISTENSEN, Justice.**

Plaintiff seeks review of a district court order granting summary judgment to the defendants on all claims in an employment case. On appeal, plaintiff raises three issues. He argues the district court erred when it determined judicial review following the administrative process was the exclusive means to seek redress for alleged retaliation against a whistleblower. Next, he argues the district court erred by denying his age discrimination claim. Lastly, the plaintiff challenges the district court's finding of no "outrageous" conduct sufficient to support his tort of intentional infliction of emotional distress.

We must first decide whether plaintiff's direct civil action under Iowa Code section 70A.28(5) (2014), the whistleblower statute, is precluded by the availability of an administrative remedy. Relying on this court's decision in *Walsh v. Wahlert*, 913 N.W.2d 517 (2018), we conclude section 70A.28(5) expressly creates an independent cause of action in the alternative to administrative remedies under Iowa Code chapter 17A. Therefore, we reverse summary judgment as to that issue. For plaintiff's claim of age discrimination under the Iowa Civil Rights Act, we affirm the district court's determination that plaintiff failed to present sufficient evidence from which a reasonable jury could infer age discrimination was the real reason for his termination. We also affirm summary judgment on plaintiff's intentional infliction of emotional distress claim. None of the defendants' conduct was sufficiently egregious to satisfy the "outrageousness" prong.

## I. Background Facts and Proceedings.

In 1988, Larry Hedlund began a career with the Iowa Department of Public Safety (DPS) as a trooper in the Iowa State Patrol. In 1989, he

became a special agent for the Iowa Department of Criminal Investigation (DCI), and in 2010, was promoted to special agent in charge (SAC).

In October 2012, Brian London became commissioner of DPS. London then appointed Assistant Director Charis Paulson as the director of DCI. In January 2013, SAC Gerard Meyers was promoted to assistant director for field operations of DCI and became Hedlund's direct supervisor. About a month later, Hedlund composed and circulated an email critical of Meyers. Members of DCI, including Hedlund's subordinate agents, received the email. The following day, Meyers set up a meeting with Hedlund to discuss, among other things, the email. During that meeting, Hedlund was not disciplined although Meyers advised him to stop circulating critical emails. Meyers also told Hedlund he did not want to have issues with him since he was in the "twilight of his career." However, Hedlund continued sending emails critical of upper management within DPS and DCI.

On April 17, 2013, Hedlund filed a complaint with the Professional Standards Bureau (PSB) against Paulson. The complaint alleged that on August 28, 2012, Paulson distributed an email to members of DPS in violation of department policy. Hedlund also alleged Paulson condoned the persistent misuse of physical fitness incentive days. Similarly, on May 29, 2013, Hedlund filed a complaint with PSB against Meyers. The complaint alleged Meyers condoned the misuse of physical fitness incentive days and encouraged personnel to ignore parking citations.

On April 18, 2013, Paulson, Meyers, and the SACs held a conference call to discuss strategic planning regarding the Field Operations Bureau of DCI. Paulson indicated "Hedlund became extremely angry, yelled at [him] and spoke in an unprofessional and insubordinate manner." The strategic planning was again discussed during an in-person meeting on

April 23, 2013. The SACs expressed resistance to the proposed reduction of zones and agents. The issue of agent burn-out and suicide arose. Hedlund agreed with the stress-related issues and mentioned a past colleague committed suicide. Paulson reported Hedlund mentioned suicide four times. On April 25, Hedlund sent another email to his subordinates critical of DPS management.

Hedlund requested and received approval for vacation on April 26 to attend his niece's art show in Cedar Rapids. The evening before, he drove his state vehicle from Fort Dodge to Cedar Rapids where he spent the night. The next morning, Hedlund contacted Wade Kisner, a retired DCI agent, to discuss cold cases, and they met for a few hours. That same day, Paulson filed a complaint with PSB against Hedlund. Paulson claimed Hedlund had been disrespectful and insubordinate during the April 18 conference call. Unaware of Hedlund's approved vacation day, Paulson attempted to contact Hedlund on April 26. Paulson called and texted Hedlund numerous times. Paulson indicated this was an attempt to set up a meeting regarding Hedlund's conduct. When asked if he was working, Hedlund responded "yes and no."[1] Paulson rescheduled the meeting to Monday April 29[2] because of Hedlund's approved vacation day.

Hedlund departed from Cedar Rapids on the afternoon of April 26. On his way to Fort Dodge, he spotted a black SUV doing a "hard ninety." Hedlund contacted the Iowa State Patrol. Trooper Matt Eimers intercepted the speeding SUV but determined it was an official state vehicle under the operation of another Iowa State Patrol trooper for the purpose of

---

[1]Hedlund only claimed one hour of vacation on April 26.

[2]Paulson contacted Hedlund on the morning of April 29 to reschedule their meeting. The record does not indicate whether the rescheduled meeting occurred.

transporting the Governor of Iowa. The SUV was not stopped and no citation was issued.

On April 29, Hedlund sent Paulson a lengthy email regarding Meyers's inability to perform his job. A half-hour later, Hedlund sent another email to Paulson and Meyers designated "a complaint against myself." This email detailed the Governor's SUV incident. Hedlund summarized his failure to issue a citation to a speeding vehicle.

> I take full responsibility for the incident being initiated and as such will accept the responsibility of ensuring that the appropriate actions are taken to address this incident. As the ranking sworn peace officer involved in this incident and as a Supervisor with the Department of Public Safety, I should have insisted that the vehicle be stopped.

That same evening, Hedlund sent a third email to Paulson, Meyers, and his subordinates. The email indicated Hedlund needed personal time for the remainder of the day as well as April 30. In response, Meyers noted Hedlund was not on approved leave status. On April 30, Hedlund sent Paulson and Meyers an email that explained his leave request was a sick day. Hedlund's email stated, "I consider it a sick day due to the stress that I am experiencing over the issues currently going on in the DCI/DPS." Hedlund subsequently provided a doctor's letter excusing him from work April 30 through May 6.

On May 1, Hedlund was placed on administrative leave with pay and provided a notice of investigation. The notice alleged Hedlund engaged in various acts of misconduct during the previous month. That day, the PSB notice of investigation was delivered to Hedlund's home by Meyers, Assistant Director of Field Operations David Jobes, and Sergeant Wes Niles. Hedlund was relieved of his state-issued phone, car keys, service weapon, and various other items. On May 14, Hedlund was ordered to

attend a fitness-for-duty evaluation. Hedlund was declared fit for duty at that time.

PSB investigators interviewed Hedlund on June 19. On July 17, PSB issued a 500-page report of its investigation. It found Hedlund engaged in multiple acts of insubordination. That same day, Paulson terminated Hedlund. The termination alleged Hedlund engaged in unbecoming or prohibited conduct, violated the courteous behavior rule, and improperly used state property. The termination also included a notice of right to appeal in accordance with Iowa Code section 80.15.[3]

On July 18, Governor Branstad held a press conference. Governor Branstad addressed several matters, including Hedlund's termination. In response to a press question about the relationship between Hedlund's employment issues and any "morale issues" at DPS, Governor Branstad stated, "They [DPS] felt for the morale and for the safety and well-being of the Department, this was action that was necessary." When asked if the termination was required, Governor Branstad responded he believed the action was "a fair and just decision."

On August 8, Hedlund filed a petition in district court and alleged wrongful discharge in violation of public policy and violation of Iowa Code chapter 70A.[4] On August 13, Hedlund filed an appeal with the Employment Appeal Board (EAB) pursuant to Iowa Code section 80.15. On January 16, 2014, Hedlund voluntarily dismissed his EAB appeal prior to the evidentiary hearing. EAB granted the dismissal on January 22.

---

[3]Hedlund continued to receive full salary and benefits until the conclusion of the appeal. *See* Iowa Code § 80.15.

[4]Hedlund subsequently amended his petition to include the claims of intentional infliction of emotional distress and age discrimination.

Pursuant to this dismissal, DPS notified Hedlund his termination would be effective January 30.

On January 23, Hedlund filed a complaint with the Iowa Civil Rights Commission. Hedlund indicated he was discriminated against based on his age. Hedlund indicated he suffered two adverse actions— "disciplined/suspended" and "terminated." He did not claim he had been "forced to quit/retire" or "harass[ed]." The complaint named DPS and Meyers as the actors.

On January 29, one day before his termination would have become effective, Hedlund filed an application with the Peace Officers' Retirement System (PORS) for retirement benefits. The PORS Board approved Hedlund's application effective February 17. By retiring, Hedlund preserved $94,000 worth of his sick leave balance.

Defendants filed a motion to dismiss Hedlund's district court claims. The district court granted the motion with regard to Hedlund's claim of wrongful discharge in violation of public policy. Hedlund filed a motion to amend the district court's dismissal ruling. The district court denied his motion to amend. Hedlund then filed an application for interlocutory review with this court. On February 26, 2016, we dismissed his appeal. *Hedlund v. State*, 875 N.W.2d 720 (Iowa 2016). On October 5, 2017, defendants filed a motion for summary judgment on all remaining claims. The district court granted the motion and dismissed Hedlund's entire case. Hedlund appealed the district court's ruling; we retained the appeal.

## II. Standard of Review.

We review a district court's grant of summary judgment for correction of errors at law. *Linn v. Montgomery*, 903 N.W.2d 337, 342 (Iowa 2017). Summary judgment is appropriate only when the record shows no genuine issues of material fact and the moving party is entitled to

judgment as a matter of law. Iowa R. Civ. P. 1.981(3). We view the summary judgment record in a light most favorable to the nonmoving party. *Phillips v. Covenant Clinic,* 625 N.W.2d 714, 717 (Iowa 2001) (en banc). "The court must also consider on behalf of the nonmoving party every legitimate inference that can be reasonably deduced from the record." *Id.* at 717–18. "Even if the facts are undisputed, summary judgment is not proper if reasonable minds could draw different inferences from them and thereby reach different conclusions." *Banwart v. 50th St. Sports, L.L.C.*, 910 N.W.2d 540, 544–45 (Iowa 2018) (quoting *Clinkscales v. Nelson Sec., Inc.,* 697 N.W.2d 836, 841 (Iowa 2005) (per curiam)). Therefore, our review is "limited to whether a genuine issue of material fact exists and whether the district court correctly applied the law." *Pillsbury Co. v. Wells Dairy, Inc.*, 752 N.W.2d 430, 434 (Iowa 2008).

**III. Analysis.**

Hedlund raises three issues. First, Hedlund argues the district court erred in granting summary judgment on his section 70A.28 whistleblower claim. Second, Hedlund claims the district court erred in denying his age discrimination claim. Lastly, Hedlund contends the district court erred in granting summary judgment on the outrageousness prong of his claim for intentional infliction of emotional distress.

**A. Whistleblower.**

1. *Civil action.* The issue before us concerns the availability of remedies under two distinct Iowa Code provisions. Iowa Code section 70A.28[5] and Iowa Code section 80.15 each address adverse employment action against state employees. Hedlund seeks the remedy of section

---

[5]Amended in 2019, Iowa Code section 70A.28(5)(*a*) now includes "civil damages in an amount not to exceed three times the annual wages and benefits received by the aggrieved employee prior to the violation of subsection 2."

70A.28, commonly known as Iowa's whistleblower statute. *See* Iowa Code § 70A.28. We must decide whether Hedlund's direct civil action is precluded by the availability of section 80.15.

Last term this court decided *Walsh*, 913 N.W.2d 517. We addressed the statutory framework of Iowa's whistleblower statute and parsed the "151-word linguistic jungle" to reveal the relevant portion,

> A person shall not discharge an employee . . . as a reprisal . . . for a disclosure of any information by that employee to a member or employee of the general assembly . . . or a disclosure of information to any other public official or law enforcement agency if the employee reasonably believes the information evidences a violation of law or rule . . . .

*Walsh*, 913 N.W.2d at 521 (quoting Iowa Code § 70A.28(2)). Walsh—and now Hedlund—relied on language in the whistleblower statute allowing the provisions of section 70A.28(2) to "be enforced through a civil action." *Id.* at 521, 524 (quoting Iowa Code § 70A.28(5)).

A potential alternative to section 70A.28(5)'s civil action is found in Iowa Code section 80.15. It provides the statutory framework for discipline and dismissal of peace officers within DPS. The relevant portion states,

> After the twelve months' service, a peace officer of the department . . . is not subject to dismissal, suspension, disciplinary demotion, or other disciplinary action resulting in the loss of pay unless charges have been filed with the department of inspections and appeals and a hearing held by the employment appeal board . . . if requested by the peace officer, at which the peace office has an opportunity to present a defense to the charges. The decision of the appeal board is final, subject to the right of judicial review in accordance with the terms of the Iowa administrative procedure Act, chapter 17A.

Iowa Code § 80.15. Hedlund fits squarely within this definition. It is the defendants' position that section 80.15, and therefore the administrative remedy under chapter 17A, is the exclusive means to seek judicial review.

We disagree. Our holding in *Walsh* is controlling. *See Walsh*, 913 N.W.2d at 525.

Section 80.15 is not the exclusive means for Hedlund to seek remedy. Iowa Code section 70A.28(5) "expressly creates an independent cause of action in the alternative to administrative remedies under Iowa Code chapter 17A." *Id.* We have previously emphasized "section 70A.28 established 'a public policy against retaliatory discharge of public employees and considers the violation of the policy to be a public harm.' " *Id.* at 524 (quoting *Worthington v. Kenkel*, 684 N.W.2d 228, 231, 233 (Iowa 2004) (allowing section 80.15 employee to seek injunctive relief under section 70A.28(5)(*b*))). Because the legislature expressly created section 70A.28(5) as an independent statutory cause of action, a challenge to agency action under the administrative procedure act is not the exclusive means of obtaining judicial review. *See id.* at 525. Hedlund may seek judicial review of DPS action through 70A.28(5)'s civil action. "To hold otherwise would eliminate a choice of remedies that the legislature expressly created." *Id.* The district court erred in granting summary judgment against Hedlund's 70A.28 claim.

2. *Conduct covered by section 70A.28.* The district court granted defendants' summary judgment before reaching the merits of Hedlund's section 70A.28 whistleblower claim. It is defendants' position summary judgment remains appropriate because Hedlund did not satisfy the statutory requirements of his claim. To engender the whistleblower's statutory remedy, Hedlund must disclose information to a "public official or law enforcement agency" and reasonably believe "the information evidences a violation of law or rule, mismanagement, a gross abuse of funds, an abuse of authority, or a substantial and specific danger to public health or safety." Iowa Code § 70A.28(2). Hedlund asserts reasonable

minds could draw different inferences and reach different conclusions with respect to whom the disclosures of information were made and whether the information evidences a type of wrongdoing. When viewing the evidence in the light most favorable to Hedlund and drawing all legitimate inferences therefrom, we agree summary judgment is not appropriate.

The parties do not dispute Hedlund made three separate disclosures. The first two disclosures were complaints Hedlund filed with PSB. The third disclosure was Hedlund's April 29 email to Paulson and Meyers. Defendants articulate such disclosures were not made to a qualifying public official or law enforcement agency. Hedlund indicates that PSB, as part of DPS, is a proper law enforcement agency, and that the April 29 email to Paulson and Meyers was directed to London, the commissioner of DPS. At minimum, we determine the commissioner of DPS qualifies as a law enforcement agency under the whistleblower statute. *See* Iowa Code §§ 80.1, .2, .9 (creating DPS and establishing "[i]t shall be the duty of the department to prevent crime, to detect and apprehend criminals, and to enforce such other laws as are hereinafter specified"). Therefore, Hedlund has shown reasonable minds could differ as to whether he made disclosures to the proper entities.

Defendants also contend that Hedlund is nothing more than a "chronic complainer" and that his disclosures are not whistleblowing. *See Blackburn v. United Parcel Serv. Inc.*, 3 F. Supp. 2d 504, 517 (D.N.J. 1998). But when affording Hedlund every legitimate inference, summary judgment is improper as to whether the information evidences a type of wrongdoing. Hedlund's PSB complaints concerned, among other things, his supervisors' condoned misuse of agent time off and the encouragement to ignore lawfully issued parking citations. Further, Hedlund's April 29 email recounted "the [well-known] dangers of traveling at a high rate of

speed" and how the speeding state vehicle "can quickly put others at risk." This information is not some trivial matter or a subjective disagreement with the actions of a supervisor; the disclosures could reasonably evidence "a violation of law or rule, mismanagement, a gross abuse of funds, an abuse of authority, or a substantial and specific danger to public health or safety." Iowa Code § 70A.28(2); *see also Fraternal Order of Police, Lodge 1 v. City of Camden*, 842 F.3d 231, 241 (3d Cir. 2016) (disagreeing with defendant's view that police officers were "chronic complainers" and "squeaky wheels"). Hedlund has again demonstrated reasonable minds could reach different conclusions on whether his disclosure of information evidences the statutory requirements of Iowa Code section 70A.28(2).

3. *Recovery under section 70A.28.* Upon remand, Hedlund asserts he is entitled to a jury trial and damages for emotional distress. Although the district court did not reach the stated issues, the parties extensively addressed each issue during the summary judgment proceeding. We address the issues in tandem.

Generally, there is no right to a jury trial for cases brought in equity. *Weltzin v. Nail*, 618 N.W.2d 293, 296 (Iowa 2000) (en banc). "[L]aw issues are for the jury and equity issues are for the court." *Westco Agronomy Co. v. Wollesen*, 909 N.W.2d 212, 225 (Iowa 2017). To determine a proceeding as legal or equitable, we look to the pleadings, relief sought, and nature of the case. *Carstens v. Cent. Nat'l Bank & Tr. Co. of Des Moines*, 461 N.W.2d 331, 333 (Iowa 1990) ("The fact that an action seeks monetary relief does not necessarily define the action as one at law."). Hedlund's petition seeks relief pursuant to subsection 5(*a*) of the whistleblower statute. This states,

> A person who violates subsection 2 is liable to an aggrieved employee for affirmative relief including reinstatement, with or without back pay, or *any other equitable relief* the court deems appropriate, including attorney fees and costs.

Iowa Code § 70A.28(5)(*a*) (emphasis added). "Under the doctrine of last preceding antecedent, qualifying words and phrases refer only to the immediately preceding antecedent, unless a contrary legislative intent appears." *Iowa Comprehensive Petroleum Underground Storage Tank Fund Bd. v. Shell Oil Co.*, 606 N.W.2d 376, 380 (Iowa 2000) (en banc). When we look to the language of section 70A.28(5)(*a*), "any other equitable relief" necessarily implies the "affirmative relief" authorized is equitable. Iowa Code § 70A.28(5)(*a*); *see Fjords N., Inc. v. Hahn*, 710 N.W.2d 731, 737–38 (Iowa 2006). We also look to the intent of our legislature. *Fjords*, 710 N.W.2d at 738. We note relief under the Iowa Civil Rights Act provides for actual damages. *See* Iowa Code § 216.15(9)(*a*)(8) ("Payment to the complainant of damages for an injury caused by the discriminatory or unfair practice which damages shall include but are not limited to actual damages, court costs and reasonable attorney fees."). If the legislature intended to permit actual damages under the relief of section 70A.28(5)(*a*), it would have so provided. *See Shumate v. Drake Univ.*, 846 N.W.2d 503, 516 (Iowa 2014) (holding that the legislature's "express inclusion" of recovery rights in one provision but not another indicates the omission was intentional). Therefore, the affirmative relief under section 70A.28(5)(*a*) is equitable relief.

**B. Age Discrimination.** At the summary judgment stage, the district court determined Hedlund did not present sufficient evidence "from which a reasonable jury could infer that age must have actually played a role in the employer's decision making process and had a determinative influence on the outcome." Hedlund both challenges the district court's use of the *McDonnell Douglas* analytical framework at the summary judgment stage and asserts genuine issues of fact exist that he was a victim of age discrimination.

Hedlund charges age discrimination in violation of his rights under chapter 216 of the Iowa Civil Rights Act (ICRA). The ICRA states, in pertinent part,

> It shall be an unfair or discriminatory practice for any . . . [p]erson to . . . discharge any employee, or to otherwise discriminate in employment against any . . . employee because of . . . age . . . , unless based upon the nature of the occupation.

Iowa Code § 216.6(1)(*a*). This is a general proscription against discrimination and we "look[] to the corresponding federal statutes to help establish the framework to analyze claims and otherwise apply our statute." *Casey's Gen. Stores, Inc. v. Blackford*, 661 N.W.2d 515, 519 (Iowa 2003). Similarly, in *DeBoom v. Raining Rose, Inc.*, we acknowledged, "Because the Iowa Civil Rights Act was modeled after Title VII of the United States Civil Rights Act, we turn to federal law for guidance in evaluating the Iowa Civil Rights Act."[6] 772 N.W.2d 1, 10 (Iowa 2009).

To warrant submission of his age discrimination claim to the jury, Hedlund must first establish he was a victim of age discrimination. *See Vaughan v. Must, Inc.*, 542 N.W.2d 533, 538 (Iowa 1996). This may be accomplished by direct or indirect evidence. *King v. United States*, 553 F.3d 1156, 1160 (8th Cir. 2009) ("A plaintiff may establish her claim of intentional age discrimination through either direct evidence or indirect evidence."). Hedlund has offered no direct evidence of discriminatory intent;[7] therefore, he must rely on indirect evidence of discriminatory

---

[6]Although we have consistently applied federal guidance when interpreting the ICRA, "the decisions of federal courts interpreting Title VII are not binding upon us in interpreting similar provisions in the ICRA." *Estate of Harris v. Papa John's Pizza*, 679 N.W.2d 673, 678 (Iowa 2004).

[7]Direct evidence "show[s] a specific link between the alleged discriminatory animus and the challenged decision." *Griffith v. City of Des Moines*, 387 F.3d 733, 736 (8th Cir. 2004) (quoting *Thomas v. First Nat'l Bank of Wynne*, 111 F.3d 64, 66 (8th Cir. 1997)).

motive. *See Smidt v. Porter*, 695 N.W.2d 9, 14 (Iowa 2005) (invoking the *McDonnell Douglas* framework at summary judgment when plaintiff offered no direct evidence of discriminatory intent under the ICRA); *Landals v. George A. Rolfes Co.*, 454 N.W.2d 891, 893 (Iowa 1990) ("The *McDonnell Douglas* framework cannot be applied where the plaintiff uses the direct method of proof of discrimination.").

The parties disagree as to the appropriate analytical framework the district court should employ at the summary judgment stage. Hedlund asserts the *McDonnell Douglas* burden-shifting framework should be abandoned for summary judgment purposes. Defendants contend *McDonnell Douglas* remains the appropriate analytical framework at summary judgment. *See, e.g., McQuistion v. City of Clinton*, 872 N.W.2d 817, 828–29 (Iowa 2015) (applying the *McDonnell Douglas* framework at summary judgment when indirect evidence is used to infer discrimination under the ICRA); *Jones v. Univ. of Iowa*, 836 N.W.2d 127, 147–48 (Iowa 2013) (affirming grant of summary judgment under the *McDonnell Douglas* framework for race and gender discrimination claim under Title VII); *Smidt*, 695 N.W.2d at 14 (invoking *McDonnell Douglas* framework because plaintiff offered no direct evidence of discriminatory intent).[8] We do not need to decide this issue because, either way, we conclude that Hedlund has failed to raise a genuine issue of material fact.

Under the familiar *McDonnell Douglas* burden-shifting framework, Hedlund must carry the initial burden of establishing a prima facie case of age discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S. Ct. 1817, 1824 (1973). "The burden then must shift to the

---

[8]In *Hawkins v. Grinnell Reg'l Med. Ctr.*, ___ N.W.2d ___, ___ (Iowa 2019), where an age discrimination case went to trial, we held that "we no longer rely on the *McDonnell Douglas* burden-shifting analysis and determin[ing]-factor standard when instructing the jury." We did not disturb our prior law as it applies to summary judgment.

employer to articulate some legitimate, nondiscriminatory reason" for its employment action. *Id.* Finally, the burden returns to Hedlund to "demonstrate that the proffered reason is a mere pretext for age discrimination." *Rideout v. JBS USA, LLC*, 716 F.3d 1079, 1083 (8th Cir. 2013). In other words, "[i]f the employer offers a legitimate nondiscriminatory reason, the plaintiff must show the employer's reason was pretextual and that unlawful discrimination was the real reason for the termination." *Deboom*, 772 N.W.2d at 6–7 (quoting *Smidt*, 695 N.W.2d at 15); *see* Iowa Code § 216.6(1)(*a*) (It is discriminatory practice for any person "to discharge any employee . . . *because of the age.*" (Emphasis added.)); *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 141, 120 S. Ct. 2097, 2105 (2000) ("That is, the plaintiff's age must have 'actually played a role in [the employer's decisionmaking] process and had a determinative influence on the outcome.'" (alterations in original) (quoting *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610, 113 S. Ct. 1701, 1706 (1993))).

Under *McDonnell Douglas*, we can assume that Hedlund made out a prima facie case. Regardless, defendants have produced legitimate nondiscriminatory reasons for Hedlund's termination. Hedlund communicated "negative and disrespectful messages" about DCI and members of its leadership team with his subordinate employees. Further, Hedlund drove a state vehicle to Cedar Rapids for nonwork related purposes and was deceptive about his work status when questioned. Simply put, defendants contend Hedlund was served notice of his termination after he violated multiple DCI departmental rules and

regulations.[9]  These are legitimate, nondiscriminatory reasons for defendants' actions.  Hedlund now retains the ultimate burden of producing evidence from which a reasonable jury could conclude the defendants' proffered reasons were pretextual "and that unlawful discrimination was the real reason for the termination." *Smidt*, 695 N.W.2d at 15.

To rebut the legitimate nondiscriminatory reasons, Hedlund relies on remarks made by Meyers.  Hedlund first contends Meyers in a February 2013 meeting with Hedlund made reference to Hedlund being in the "twilight of his career."  Hedlund next contends that Meyers later inquired in a conference call in February 2013 as to when Hedlund and other SAC were planning to retire.  The district court concluded such remarks were insufficient to support an inference of age discrimination, and we agree. Employers may make reasonable inquiries into an employee's retirement plan.  *See Cox v. Dubuque Bank & Tr. Co.*, 163 F.3d 492, 497 (8th Cir. 1998) ("[M]any courts have recognized that an employer may make reasonable inquiries into the retirement plans of its employees."); *Moore v. Eli Lilly & Co.*, 990 F.2d 812, 818 (5th Cir. 1993) (A new supervisor may make "reasonable inquiries about the ages of the members of his work force and their known plans for the future—facts on which to gauge the anticipated longevity of his crew."); *Colosi v. Electri-Flex Co.*, 965 F.2d 500, 502 (7th Cir. 1986) ("[A] company has a legitimate interest in learning its employees' plans for the future, and it would be absurd to deter such inquiries by treating them as evidence of unlawful conduct.").  In fact, Hedlund was approaching, if he had not already attained, the permissible

---

[9]We note the notice of termination indicates Hedlund engaged in unbecoming or prohibited conduct, violated the courteous behavior rule, and improperly used state property.

statutory retirement age for DPS officers. *See* Iowa Code § 97A.6(1)(*a*) (authorizing retirement with full benefits at fifty-five years of age and twenty-two years of service). At this point, a DPS officer—having dedicated the better part of his or her career to the state's vital public safety mission—may have incentive to retire from DPS and potentially pursue alternative employment.

Moreover, isolated remarks, such as "twilight of his career," are not sufficient on their own to show age discrimination. *Forman v. Small*, 271 F.3d 285, 293–94 (D.C. Cir. 2001) (remarks referring to plaintiff as "over the hill" and in the "twilight of his career" insufficient to rebut defendant's nondiscriminatory reason for denying plaintiff a promotion). To infer such discriminatory feelings influenced decision makers, we look to "the relevant time in regard to the adverse employment action complained of." *Id.*; *see Hunt v. City of Markham*, 219 F.3d 649, 652 (7th Cir. 2000) (It is possible to infer decision makers were influenced by discriminatory feelings "when the decision makers themselves, or those who provide input into the decision, express such feelings (1) around the time of, and (2) in reference to, the adverse employment action complained of."). The remarks alone do not infer that the decision to terminate Hedlund was influenced by discriminatory feelings. The record reveals the reasonableness of Meyers's remarks as well as the remoteness in time. These remarks occurred five months prior to the adverse employment action of which Hedlund complains. Hedlund testified in his deposition as follows:

> Q. We've talked a little bit about that meeting, I believe, but in the course of that meeting, you indicate that "AD Meyers stated two or three times during the course of that meeting that Hedlund was in the, quote, twilight of his career, end quote." A. He made reference to me being in the twilight of my career, yes.

Q. Can you put that in context? What were you folks discussing when he made those comments? A. My recollection is he made a comment along the lines of he didn't want to have issues with me because I was in the twilight of my career. That's the best context I can recall it in.

Q. Other than that meeting on February 15, 2013, did Gerard Meyers use those words "twilight of your career" in any other conversations? A. No, not that I recall.

Q. Has Charis Paulson ever used such terms as "twilight of your career" in any conversation she's had with you? A. No.

Meyers similarly explained in his deposition:

Q. On the meeting that you had on February 15, 2013 . . . did you make the comment to Hedlund that he was in the twilight of his career? A. Yes, I did.

Q. Did you make that comment to him more than once? A. I believe it was just once.

Q. Did you make any—did you ever discuss with Hedlund when he was going to retire? A. Yes. I believe when I mentioned the twilight of his career, I was referring to his longevity and the ability that he had to rather than work cases, mentor personnel within his assigned region.

As for the retirement question that you asked, it's my recollection that at some point during this departmental strategic planning effort . . . each bureau AD was directed to inquire with any personnel of senior status to determine what their plans may be since we have a very young division and we were struggling to maintain the necessary institutional knowledge and experience.

Remarks of this kind "are remote in time and do not support a finding of pretext for intentional age discrimination." *See Walton v. McDonnell Douglas Corp.*, 167 F.3d 423, 427–28 (8th Cir. 1999) (affirming summary judgment because plaintiff failed to present sufficient evidence of pretext under *McDonnell Douglas* with remarks that occurred two years earlier). Taken in a light most favorable to Hedlund, Meyers's remarks occurred five months prior to Hedlund's notice of termination and are insufficient

to establish pretext of age animus. *See Ortiz-Rivera v. Astra Zeneca LP*, 363 F. App'x 45, 48 (1st Cir. 2010) ("[M]ere generalized 'stray remarks' . . . normally are not probative of pretext absent some discernable evidentiary basis for assessing their temporal and contextual relevance." (quoting *Straughn v. Delta Air Lines, Inc.*, 250 F.2d 23, 36 (1st Cir. 2001))).

Hedlund also attempts to show defendants' asserted reasons for his termination were pretextual by demonstrating Meyers filled Hedlund's position with a somewhat younger employee. Michael Krapfl, a forty-five year old with twenty-five years of law enforcement experience, was promoted into Hedlund's position; Hedlund was fifty-five years old with twenty-five years of law enforcement experience at the time of his termination. Hedlund cites *Landals* for the proposition that a sufficient inference of discrimination may be drawn when a plaintiff's position is eliminated and a younger employee assumes those responsibilities. 454 N.W.2d at 895. But *Landals* is an example of specific circumstances allowing for an inference of age discrimination.[10] Generally, evidence that a younger person replaced the plaintiff's position is insufficient to create a reasonable inference of age discrimination. *See Tusing v. Des Moines Indep. Cmty. Sch. Dist.*, 639 F.3d 507, 520 (8th Cir. 2011) ("This fact, in isolation, is insufficient to create a reasonable inference of age discrimination."); *Carraher v. Target Corp.*, 503 F.3d 714, 719 (8th Cir. 2007) ("Although [plaintiff] was replaced by someone substantially younger than him, in this case 28 years younger, we have previously held that this

---

[10]In *Landals*, the plaintiff was required to undergo a physical examination or face discharge after he complained of chest pains, the company president specifically ordered plaintiff's lay off a month prior, and plaintiff was terminated without any reason. 454 N.W.2d at 895. Furthermore, the fifty-two-year-old plaintiff, who had been with the company for approximately twenty-five years, was "an extremely competent and dedicated employee." *Id.* His duties were assumed by a twenty-five-year-old employee, who had been with the company for six months, and a thirty-six-year-old employee, "who had been with the company for approximately one year." *Id.*

fact . . . possesses 'insufficient probative value to persuade a reasonable jury that [plaintiff] was discriminated against." (quoting *Nelson v. J.C. Penney Co.*, 75 F.3d 343, 346 (8th Cir. 1996))). Hedlund does not provide sufficient evidence, beyond indicating an employee, younger by ten years, filled his position, to support that defendants' proffered reasons were mere pretext. The promotion of Krapfl does not cast doubt on defendant's contention that Hedlund was terminated for violating DCI departmental rules and regulations. *Cf. Waldron v. SL Indus., Inc.*, 56 F.3d 491, 496–97 (3d Cir. 1995) (holding when employer "split [plaintiff's] job, fired him, offered one-half of his former job to a younger person while the other half remained unadvertised, and then recombined the jobs and placed the younger employee in the recombined post" it cast sufficient doubt on plaintiff's discharge as part of the company reorganization).

The promotion of Krapfl also leads Hedlund to assert Meyers would give the lowest promotability scores to the oldest candidates. The summary judgment record indicates four special agents have sought promotion. Yet Hedlund only provided data for three of them: Ray Fiedler, born in 1962; Jim Thiele, born in 1965; and Michael Krapfl, born in 1969.[11] The promotional process includes a written test, interview, and a promotability score. Hedlund argues Fiedler and Thiele, the oldest of the three, received the bottom two promotability scores. Although "subjective promotion procedures are to be closely scrutinized because of their susceptibility to discriminatory abuse," *Royal v. Mo. Highway & Transp. Comm'n*, 655 F.2d 159, 164 (8th Cir. 1981), Hedlund has not provided any evidence showing Meyers made the promotional decision based on age. The summary judgment record indicates neither Thiele nor Fiedler believe age had anything to do with the promotion. Fiedler's written test score

---

[11]Hedlund was born in 1957.

was "probably middle of the pack," and he admitted, "[T]here have been other guys my age promoted." In fact, Thiele did not even apply for Hedlund's vacant position but has taken the written test every year since 2007. There is no evidence sufficient to support an inference of age discrimination based on the promotability scores of the oldest candidates.

Drawing all inferences in Hedlund's favor, Hedlund has failed to present sufficient evidence from which a reasonable jury could infer that defendants' legitimate, nondiscriminatory reason for termination was pretextual and that age discrimination was the real reason for his termination. Our rule governing summary judgment indicates Hedlund "must set forth specific facts showing that there is a genuine issue for trial." Iowa R. Civ. P. 1.981(5). Even with the formulated assistance of the *McDonnell Douglas* framework, Hedlund has not moved beyond generalities. *Slaughter v. Des Moines Univ. Coll. of Osteopathic Med.*, 925 N.W.2d 793, 808 (Iowa 2019) ("Summary judgment is not a dress rehearsal or practice run; 'it is the put up or shut up moment in a lawsuit . . . .'" (quoting *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 859 (7th Cir. 2005))).

For similar reasons, we find that there is insufficient evidence to withstand summary judgment outside of the *McDonnell Douglas* framework. Meyers's comments related to retirement rather than age. They did not show animus toward age. The comments came several months before the termination decision, with many events intervening before that decision, including Hedlund's trip to Cedar Rapids and the report on the Governor's vehicle doing a "hard ninety." This is not enough to allow a reasonable jury to infer that defendants attempted to terminate Hedlund "because of" age.

**C. Intentional Infliction of Emotional Distress.** In his final argument, Hedlund asserts the individual defendants' conduct was sufficiently egregious to satisfy the outrageousness prong of his intentional infliction of emotion distress claim. For the following reasons, we disagree.

To succeed on this claim, Hedlund must demonstrate four elements:

> (1) outrageous conduct by the defendant; (2) the defendant intentionally caused, or recklessly disregarded the probability of causing, the emotional distress; (3) plaintiff suffered severe or extreme emotional distress; and (4) the defendant's outrageous conduct was the actual and proximate cause of the emotional distress.

*Smith v. Iowa State Univ. of Sci. & Tech.*, 851 N.W.2d 1, 26 (Iowa 2014) (quoting *Barreca v. Nickolas*, 683 N.W.2d 111, 123–24 (Iowa 2004)). Hedlund must establish a prima facie case for the outrageous conduct element. *Id.* For emotional distress cases, "it is for the court to determine in the first instance, as a matter of law, whether the conduct complained of may reasonably be regarded as outrageous." *Cutler v. Klass, Whicher & Mishne*, 473 N.W.2d 178, 183 (Iowa 1991) (quoting *M.H. by and through Callahan v. State*, 385 N.W.2d 533, 540 (Iowa 1986)). Here, the district court determined Hedlund's evidence was insufficient to rise to the level of outrageous conduct.

The standard of outrageous conduct "is not easily met, especially in employment cases." *Van Baale v. City of Des Moines*, 550 N.W.2d 153, 157 (Iowa 1996), *abrogated on other grounds by Godfrey v. State*, 898 N.W.2d 844, 864, 872 (Iowa 2017). We have said the outrageous conduct "must be extremely egregious; mere insults, bad manners, or hurt feelings are insufficient." *Id.* at 156.

> Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.

> Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

*Northrup v. Farmland Indus., Inc.*, 372 N.W.2d 193, 198 (Iowa 1985) (en banc) (quoting Restatement (Second) of Torts § 46 cmt. d, at 73 (Am. Law Inst. 1965)).  We require substantial evidence of extreme conduct.  *Vinson v. Linn-Mar Cmty. Sch. Dist.*, 360 N.W.2d 108, 118 (Iowa 1984).

"When evaluating claims of outrageous conduct arising out of employer-employee relationships, we have required a reasonable level of tolerance.  Every unkind and inconsiderate act cannot be compensable." *Vaughn v. Ag Processing, Inc.*, 459 N.W.2d 627, 636 (Iowa 1990) (en banc) (citation omitted).  "Despite our caselaw that indicates an employer 'has a duty to refrain from abusive behavior toward employees,' we have often found that conduct by employers and coworkers did not rise to the level of outrageous conduct."  *Smith*, 851 N.W.2d at 26 (quoting *Vinson*, 360 N.W.2d at 118); *see, e.g.*, *Fuller v. Local Union No. 106, United Bhd. of Carpenters*, 567 N.W.2d 419, 421, 423 (Iowa 1997) (determining "in no way could the conduct alleged here qualify" as outrageous conduct after fellow union members filed a false police report of plaintiff's intoxicated driving that led to union's violation of plaintiff's contractual rights); *Van Baale*, 550 N.W.2d at 155, 157 (holding police officer's termination did not amount to outrageous conduct after his supervisor recanted the "guarantee" to continued employment if he entered guilty and nolo contendere pleas on a domestic abuse charge instead of proceeding to trial as initially planned); *Reihmann v. Foerstner*, 375 N.W.2d 677, 681 (Iowa 1985) (agreeing the record did not contain substantial evidence of outrageous conduct when supervisor used his influence to move plaintiff's office to a different city).

In *Vinson*, we determined an employer's eight-step "campaign of harassment" was not conduct sufficient to "[rise] to the level of extremity essential to support a finding of outrageousness." 360 N.W.2d at 119. After questioning the school district's seniority policy, the plaintiff was singled out for "special scrutiny." *Id.* The campaign included accusing the plaintiff of falsifying time records, discharging her on the ground of dishonesty, and reporting the incident to a prospective employer despite "knowing the report would be so received and harm plaintiff's chance of being employed, and knowing that plaintiff had not acted dishonestly." *Id.* We determined a jury could find the actions as "petty and wrong, even malicious," but we did not believe "the conduct went beyond all possible bounds of decency and must be regarded as atrocious and utterly intolerable in a civilized community." *Id.*

We have held certain conduct sufficiently outrageous. That was the special circumstances of *Smith*, 851 N.W.2d at 28–29. There, the case "presente[d] the confluence of several factors" that "exceeded a 'deliberate campaign to badger and harass' Smith and crossed the line into outrageous conduct." *Id.* at 28 (quoting *Vinson*, 360 N.W.2d at 119). "The conduct included, but also went beyond, typical bad boss behavior such as discrimination in pay, isolation of the employee, removal of the employee from work assignments, misrepresentations about promotions, and even falsification of records." *Id.* at 29. Although "the issue [was] a close one," *Smith* involved a striking, "unremitting psychological warfare . . . over a substantial period of time." *Id.* at 28–29. Smith's supervisor treated him as a mentally unstable outcast in order to cover up what amounted to her theft from the university. *Id.* at 29.

Hedlund positions his case as distinct from "typical bad boss behavior" and more akin to an "unrelenting campaign" to destroy his life

and career. Specifically, Hedlund focuses on two behaviors. He first claims defendants deliberately endangered lives when DPS arrived at his house to place him on administrative leave. Based on our review of the summary judgment record, we agree with the district court's conclusion that this behavior did not rise to the level of outrageous conduct. It is typical practice for DPS to place an individual on administrative leave pending a fitness-for-duty evaluation. The record indicates Paulson met with a representative from PSB, the department of administrative services, and the attorney general's office to discuss appropriate actions regarding Hedlund's escalating behavior. Paulson and Meyers were concerned for their own safety as well as Hedlund's personal safety. It was determined, therefore, the most appropriate action was administrative leave pending a fitness-for-duty evaluation. Notably, Hedlund was placed on leave without incident.

Hedlund also alleges his supervisors repeated known falsehoods, regarding his threat to public safety, to Governor Branstad knowing the Governor would broadcast the falsehoods statewide. According to Hedlund, this led to his humiliation in front of coworkers, peers, and the community. We are not persuaded. Even when viewed in the light most favorable to Hedlund, this case is most similar to *Vinson*'s deliberate campaign to badger and harass. The comment by the Governor stating, "[DPS] felt for the morale and for the safety and well-being of the Department, this was action that was necessary," is not substantial evidence of conduct "so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Vinson*, 360 N.W.2d at 118 (quoting *Harsha v. State Sav. Bank*, 346 N.W.2d 791, 801 (Iowa 1984)).

In addition, we do not believe the conduct Hedlund endured is comparable to unremitting psychological warfare over a substantial period of time. *See Smith*, 851 N.W.2d at 29 ("[T]he conduct included, but also went beyond, typical bad boss behavior . . . . What is striking . . . [was the] unremitting psychological warfare against Smith over a substantial period of time."). A jury could find certain aspects of the defendants' actions as petty, wrong, or even malicious. But this would not lead an average member of the community to arouse resentment against the defendants and to exclaim, "Outrageous!"

The district court determined the individual defendants were entitled to summary judgment on this issue. We find no error with this conclusion.

**IV. Conclusion.**

For the aforementioned reasons, the judgment of the district court is affirmed in part and reversed in part. Specifically, we affirm the district court's grant of summary judgment with regard to Hedlund's claims of age discrimination and intentional infliction of emotional distress. We reverse the district court's grant of summary judgment with regard to Hedlund's whistleblower claim. We remand to the district court for further proceedings.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

All justices concur except Appel, J., and Cady, C.J., and Wiggins, J., who concur in part and dissent in part.

**APPEL, Justice (concurring in part and dissenting in part).**

## I. Introduction.

I concur in part and dissent in part. I concur in the majority's conclusion that a whistleblower claim is available to Hedlund under *Walsh v. Wahlert*, 913 N.W.2d 517 (Iowa 2018). I also concur that the district court properly dismissed Hedlund's intentional infliction of emotional distress claim.

I write on two issues. First, I dissent from the affirmance of summary judgment on Hedlund's civil rights claim. Second, I agree with the majority's result on the remedial questions regarding Iowa Code section 70A.28(5)(*a*) (2014) but offer a different analysis.

## II. Iowa Civil Rights Act Claim.

The majority finesses the question of whether the test announced by the United States Supreme Court in *McDonnell Douglas* applies to motions for summary judgment under the Iowa Civil Rights Act (ICRA). I would answer the question head on.

In my view, we should expressly make clear there is no place for the *McDonnell Douglas* test at the summary judgment stage for ICRA mixed-motive cases. The proper test is the "a motivating factor" test. That is the standard at trial. It would certainly be odd, to say the least, to apply a standard at summary judgment that is different than the standard at trial. In my view, deciding not to apply *McDonnell Douglas* at the summary judgment stage in an action under the ICRA is an easy call and there is no reason to allow any marginal uncertainty to exist on the issue.

Further, whatever standard we apply, our role is to act as judges, not jurors. We do not weigh evidence on summary judgment, and all inferences from the evidence are to be made *in favor* of the nonmoving

party. I do not understand, for instance, how the majority can conclude that a supervisor's comments about Hedlund being in the twilight of his career and inquiries about his retirement plans in the context of a personnel discussion did not relate to age without making an inference *against* Hedlund, the nonmoving party. In my view, the majority crosses the line and usurps the jury function by making inferences adverse to the nonmoving party and by weighing the evidence in order to affirm the granting of the defendants' motion for summary judgment in this case.

**A. The Proper Standard at Summary Judgment on an Age Discrimination Claim.** In evaluating the age discrimination claim at trial and at summary judgment, the proper test under the ICRA is not the *McDonnell Douglas* burden-shifting/determinative-factor test. Instead, the proper test under Iowa law is the a-motivating-factor test.

1. *United States Supreme Court precedent.* In *McDonnell Douglas Corp. v. Green*, the United States Supreme Court announced a framework for evaluating evidence in discrimination claims under Title VII. 411 U.S. 792, 802–05, 93 S. Ct. 1817, 1824–26 (1973). According to the framework in *McDonnell Douglas*, when the plaintiff alleges she was rejected for a position because of unlawful discrimination, the plaintiff must first show that she was a member of a protected class, was qualified for the position, and was rejected for the position and that the employer sought other candidates of the plaintiff's qualifications. *See id.* at 802, 93 S. Ct. at 1824. The burden of production then shifts to the employer to show a nondiscriminatory reason for its employment action. *Id.* Once the employer articulates a legitimate business reason, the plaintiff is required to show the reason for the decision was pretextual. *Id.* at 804–05, 93 S. Ct. at 1825–26.

From the outset, *McDonnell Douglas* was flawed. It presumed that there was only a single reason for the challenged decision. *See, e.g.*, *Fields v. N.Y. State Office of Mental Retardation & Developmental Disabilities*, 115 F.3d 116, 119 (2d Cir. 1997) (acknowledging distinction between single-motive and mixed-motive cases). In fact, that is rarely the case. What happens when there are several reasons for a decision, one of which is unlawful? The plaintiff might not prove that all the reasons advanced by the employer were pretextual, but illegal discrimination might have been a motivating factor in the adverse employment action.

The Supreme Court considered the mixed-motive question in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 232, 109 S. Ct. 1775, 1781 (1989) (plurality opinion), *superseded by statute*, Civil Rights Act of 1991, Pub. L. No. 102-166, § 107, 105 Stat. 1071, 1075 (codified at 42 U.S.C. §§ 2000e–2(m), 2000e–5(g)(2)(B) (2012)). Under *Price Waterhouse*, the plaintiff has the initial burden of proving that discriminatory animus "played a motivating part in an employment decision." *Id.* at 244, 109 S. Ct. at 1787. Once that burden is met, the employer "may avoid a finding of liability only by proving that it would have made the same decision even if it had not allowed [the protected characteristic] to play such a role." *Id.* at 244–45, 109 S. Ct. at 1787–88 (footnote omitted).

In the controlling concurring opinion, Justice O'Connor indicated that the burden would shift to an employer in a mixed-motive case where the plaintiff "show[s] by direct evidence that an illegitimate criterion was a substantial factor in the decision." *Id.* at 276, 109 S. Ct. at 1804 (O'Connor, J., concurring in the judgment). In cases involving entangled multiple motives, she explained, tort law sometimes shifts the burden of proof on the causation issue to defendants because not doing so would demand "the impossible" from plaintiffs. *Id.* at 263–64, 109 S. Ct. at 1797–

98 (quoting Wex S. Malone, *Ruminations on Cause-in-Fact*, 9 Stan. L. Rev. 60, 67 (1956)). Justice O'Connor noted that, similarly, plaintiffs in Title VII cases are unable to untangle the threads of multiple causation. *Id.* at 273, 109 S. Ct. at 1802–03.

At this point, Congress intervened. The Civil Rights Act of 1991 codified the a-motivating-factor standard and provided that liability is established if a plaintiff proves that a protected characteristic "was a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e–2(m). The legislation also changed the import of the same-decision defense that the *Price Waterhouse* Court announced. *Id.* § 2000e–5(g)(2)(B).

The approach to Title VII claims developed in *Price Waterhouse* and modified in the Civil Rights Act of 1991 is commonly known as the mixed-motive approach. This is because it recognizes that an employer may have had *both* an impermissible motive and a permissible motive for an employment decision. This is a contrast with the pretext or single-motive approach stemming from *McDonnell Douglas*.

In the wake of congressional action, the question arose whether Justice O'Connor's requirement in *Price Waterhouse* of direct evidence to trigger the a-motivating-factor test had continued vitality. The Supreme Court addressed the issue in *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 98–101, 123 S. Ct. 2148, 2153–55 (2003). In *Desert Palace*, the Supreme Court rejected the distinction between direct and indirect evidence. *Id.* at 99–100, 123 S. Ct. at 2154. It concluded that in order to obtain a mixed-motive jury instruction, "a plaintiff need only present sufficient evidence for a reasonable jury to conclude, by a preponderance of the evidence, that '[a protected characteristic] was a motivating factor for any employment practice.'" *Id.* at 101, 123 S. Ct. at 2155 (quoting 42 U.S.C. § 2000e–2(m)).

*Desert Palace* did not expressly rule that *McDonnell Douglas* was no longer applicable at summary judgment in a mixed-motive case, but because it obliterated the distinction between direct and indirect evidence embraced in *Price Waterhouse,* it logically follows that the a-motivating-factor test now applies in all mixed-motive cases.

2. *Federal precedent since* Desert Palace. Since *Desert Palace,* the federal circuit courts have addressed the question of the proper test for Title VII claims in the context of a motion for summary judgment. The federal circuits employ four different approaches to summary judgment on mixed-motive claims like Hedlund's. Application of *McDonnell Douglas* at summary judgment is not consistent with the approach taken under federal law in all but one of the circuits.

The United States Courts of Appeals for the Sixth and Eleventh Circuits have adopted a two-pronged test for summary judgment on a mixed-motive discrimination claim. Their test utilizes the a-motivating-factor standard.

> [T]o survive a defendant's motion for summary judgment, a Title VII plaintiff asserting a mixed-motive claim need only produce evidence sufficient to convince a jury that: (1) the defendant took an adverse employment action against the plaintiff; and (2) "race, color, religion, sex, or national origin was *a* motivating factor" for the defendant's adverse employment action.

*White v. Baxter Healthcare Corp.,* 533 F.3d 381, 400 (6th Cir. 2008) (quoting 42 U.S.C. § 2000e–2(m) (2000)); *accord Quigg v. Thomas Cty. Sch. Dist.,* 814 F.3d 1227, 1232–33 (11th Cir. 2016). "We . . . hold[] that the *McDonnell Douglas/Burdine* burden-shifting framework does *not* apply to the summary judgment analysis of Title VII mixed-motive claims." *White,* 533 F.3d at 400.

The Sixth and Eleventh Circuits explain that applying *McDonnell Douglas* at summary judgment makes little sense in the context of mixed-motive claims. *McDonnell Douglas* was designed, the *White* court notes, to deal with single-motive cases, i.e., cases in which the plaintiff argues that the only motive for the adverse employment action was discriminatory. *Id.* at 400–01. In single-motive cases,

> narrowing of the actual reasons for the adverse employment action is necessary to determine whether there is sufficient evidence to proceed to trial . . . because the plaintiff in such a case must prove that the defendant's discriminatory animus, and not some legitimate business concern, was the ultimate reason for the adverse employment action.

*Id.* at 401. But in mixed-motive cases, a plaintiff need not rebut all potential "legitimate motivations of the defendant as long as the plaintiff can demonstrate that an illegitimate discriminatory animus factored into the defendant's decision to take the adverse employment action." *Id.* The Eleventh Circuit puts a fine point on the matter:

> [I]f an employee cannot rebut her employer's proffered reasons for an adverse action but offers evidence demonstrating that the employer also relied on a forbidden consideration, she will not meet her burden [under *McDonnell Douglas*]. Yet, this is the exact type of employee that the mixed-motive theory of discrimination is designed to protect. In light of this clear incongruity between the *McDonnell Douglas* framework and mixed-motive claims, it is improper to use that framework to evaluate such [mixed-motive] claims at summary judgment.

*Quigg,* 814 F.3d at 1238 (citation omitted).

A second group of federal circuits—the First, Fourth, Seventh, Ninth, and D.C. Circuits—"do not require the use of the *McDonnell Douglas* framework in mixed-motive cases involving circumstantial evidence." *Id.* at 1239 & n.8 (collecting cases). In the Fourth Circuit, "[a] plaintiff can survive a motion for summary judgment by presenting direct or circumstantial evidence that raises a genuine issue of material fact as to

whether an impressible factor such as race motivated the employer's adverse employment decision." *Diamond v. Colonial Life & Accident Ins. Co.*, 416 F.3d 310, 318 (4th Cir. 2005). The same rule applies in the other four circuits. *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1122 (9th Cir. 2004); *Hillstrom v. Best W. TLC Hotel*, 354 F.3d 27, 31 (1st Cir. 2003); *see Hossack v. Floor Covering Assocs. of Joliet, Inc.*, 492 F.3d 853, 860–62 (7th Cir. 2007); *Fogg v. Gonzales*, 492 F.3d 447, 451 & n.* (D.C. Cir. 2007).

A third group of federal circuits—the Second, Third, Fifth, and Tenth—while employing a modified form of *McDonnell Douglas*, permit a plaintiff to survive summary judgment on a mixed-motive claim if a protected characteristic was a motivating factor in the adverse employment decision. *See Quigg*, 814 F.3d at 1238–39 (collecting cases). In the Fifth Circuit, a Title VII plaintiff asserting a mixed-motive claim can survive summary judgment where there is a genuine dispute "that the defendant's reason, while true, is only one of the reasons for its conduct, and another 'motivating factor' is the plaintiff's protected characteristic." *Rachid v. Jack In The Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004) (quoting *Rishel v. Nationwide Mut. Ins.*, 297 F. Supp. 2d 854, 865 (M.D.N.C. 2003)). In the Second Circuit, summary judgment is not appropriate where "[t]here is sufficient evidence in the record to permit a reasonable jury to conclude that the [employment decision] was based, at least in part, upon a[n impermissible] motive." *Holcomb v. Iona Coll.*, 521 F.3d 130, 144 (2d Cir. 2008). "[A] plaintiff who . . . claims that the employer acted with mixed motives is not *required* to prove that the employer's stated reason was a pretext." *Id.* at 141–42. In the Tenth Circuit, a framework derived from *Price Waterhouse*, rather than *McDonnell Douglas*, governs mixed-motive claims. *Fye v. Okla. Corp. Comm'n*, 516 F.3d 1217, 1224–26 (10th Cir.

2008); *see Quigg,* 814 F.3d at 1239. In the Third Circuit, *McDonnell Douglas*

> does not apply in a mixed-motive case in the way it does in a pretext case because the issue in a mixed-motive case is not whether discrimination played the dispositive role but merely whether it played "a motivating part" in an employment decision.

*Makky v. Chertoff,* 541 F.3d 205, 214 (3d Cir. 2008).

Finally, "the Eighth Circuit is alone in holding that . . . the *McDonnell Douglas* approach must be applied in the present context [of summary judgment on a mixed-motive claim of discrimination]." *Quigg,* 814 F.3d at 1239; *see Griffith v. City of Des Moines,* 387 F.3d 733, 735–36 (8th Cir. 2004).

I do not agree with the notion that federal law should do anything more in our resolution of claims under the ICRA than offer reasoning that we might or might not find persuasive. Here, I find the overwhelming weight of federal authority persuasive on the point that *McDonnell Douglas* is not appropriate as the test for summary judgment on mixed-motive claims because it was not designed for such claims. It is illogical to apply a standard designed for determining whether there was only one motivation for an employment action to claims where the plaintiff need only show that an impermissible motivation was among the motivations for the action.

3. *Other state precedent.* Other states have also recognized that the *McDonnell Douglas* framework is inappropriate for resolving claims at summary judgment.

In *Gossett v. Tractor Supply Co.,* the Tennessee Supreme Court rejected application of *McDonnell Douglas* at summary judgment on mixed-motive claims. 320 S.W.3d 777, 781–82 (Tenn. 2010), *superseded by*

*statute*, 2011 Tenn. Pub. Acts ch. 461, § 2 (codified as amended at Tenn. Code Ann. § 50-1-304(g) (West, Westlaw through 2019 First Reg. Sess. of the 111th Tenn. Gen. Assemb.)), *as recognized in Williams v. City of Burns*, 465 S.W.3d 96, 112 n.15 (Tenn. 2015). The *Gossett* court explained that "the *McDonnell Douglas* framework does not necessarily demonstrate that there is no genuine issue of material fact" because, while that framework only requires a defendant to proffer a legitimate alternative for the discharge, "[a] legitimate reason for discharge . . . is not always mutually exclusive of a discriminatory or retaliatory motive and thus does not preclude the possibility that a discriminatory or retaliatory motive played a role in the discharge decision." *Id.* at 782. "Furthermore," the *Gossett* court recognized, "evidence showing a legitimate reason for discharge can satisfy the requirements of the *McDonnell Douglas* framework without tending to disprove any factual allegation by the employee." *Id.* Additionally, the *Gossett* court acknowledged that "the shifting burdens of the *McDonnell Douglas* framework obfuscate the trial court's summary judgment analysis" because, "[i]nstead of demonstrating the absence of any genuine issue of material fact, the framework focuses on the 'sensitive and difficult' factual question of whether an employer's decision to discharge an employee was discriminatory or retaliatory." *Id.* at 783 (quoting *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 716, 103 S. Ct. 1478, 1482 (1983)). After *Gossett*, the Tennessee legislature incorporated language into Tennessee statutes that we do not have in the Iowa Code, namely, that the trial standard for proving discrimination follows *McDonnell Douglas*. *See* 2011 Tenn. Pub. Acts ch. 461, § 1 (codified at Tenn. Code Ann. § 4-21-311(e) (West, Westlaw through 2019 First Reg. Sess. of the 111th Tenn. Gen. Assemb.)); *id.* § 2.

In Oregon and North Dakota, the *McDonnell Douglas* framework is inapplicable at summary judgment and a defendant cannot obtain summary judgment merely by pointing to a legitimate reason for the employment action. *Heng v. Rotech Med. Corp.*, 688 N.W.2d 389, 401 (N.D. 2004); *Williams v. Freightliner, LLC*, 100 P.3d 1117, 1121–23 (Or. Ct. App. 2004); *Lansford v. Georgetown Manor, Inc.*, 84 P.3d 1105, 1115 (Or. Ct. App.), *modified on other grounds on reh'g*, 88 P.3d 305, 305 (Or. Ct. App. 2004). In North Dakota, "[t]he burden-shifting rule of *McDonnell Douglas* . . . has little or no application at the summary judgment stage" because

> [b]y presenting a prima facie case of retaliatory discharge, the employee has created a genuine issue of material fact on the question of why she was fired, and the employer's alleged nonretaliatory reasons for the termination merely go to that question of fact.

*Heng*, 688 N.W.2d at 401. "[T]he employer's presentation of evidence of a legitimate, nonretaliatory reason for its action merely creates an issue of fact, not a basis for summary judgment dismissal of the employee's claim." *Id.* Similarly, in Oregon, "after a plaintiff has presented evidence of discrimination, evidence of an employer's nondiscriminatory motive in terminating an employee will not support summary judgment." *Freightliner, LLC*, 100 P.3d at 1123.

Likewise, in *Brady v. Cumberland County*, the Maine Supreme Judicial Court held the *McDonnell Douglas* burden-shifting framework inapposite to a mixed-motive claim for whistleblower retaliation. 126 A.3d 1145, 1154 (Me. 2015). "[I]n a summary judgment motion in a [whistleblower protection act] retaliation case," the *Brady* court explained, "it is unnecessary to shift the burden of production pursuant to *McDonnell Douglas* once the plaintiff . . . has presented the requisite evidence that

the adverse employment action was motivated at least in part by retaliatory intent." *Id.* "[I]f the employee presents evidence of a causal connection between protected activity and adverse employment action, then the employee has created a record sufficient to defeat an employer's motion for summary judgment." *Id.* at 1157. "[T]he employer's evidence of a lawful reason for the adverse employment action . . . merely creates a dispute of material fact and precludes the court from granting summary judgment to the employee." *Id.*

The view that *McDonnell Douglas* has no continued vitality is not universally embraced by state courts. A number of them, with little or no analysis, have continued to apply *McDonnell Douglas* even after *Desert Palace. See, e.g., Serri v. Santa Clara Univ.*, 172 Cal. Rptr. 3d 732, 758 (Ct. App. 2014); *Scrivener v. Clark Coll.*, 334 P.3d 541, 545–46 (Wash. 2014) (en banc).

4. *Iowa precedent.* In Iowa, we have evaluated civil rights claims at the summary judgment stage under both the *McDonnell Douglas* and the a-motivating-factor standards. The applicable standard has been driven by the framework applied by the parties.[12] For instance, in *Smidt v. Porter*, the plaintiff invoked *McDonnell Douglas.* 695 N.W.2d 9, 14 (Iowa 2005). And "[n]either party challenge[d] the viability of the *McDonnell Douglas* framework after *Desert Palace.*" *Id.* at 14 n.1. Similarly, in *Jones v. University of Iowa*, the plaintiff "advanc[ed] the *McDonnell Douglas*

---

[12]The majority states that "Hedlund asserts the *McDonnell Douglas* burden-shifting framework should be abandoned for summary judgment purposes" and "[d]efendants contend *McDonnell Douglas* remains the appropriate analytical framework at summary judgment." But there is nothing to abandon or remain. The cases cited by the defendants, as discussed herein, establish nothing more than the proposition that we have applied the framework advanced by the plaintiff. *Jones v. Univ. of Iowa*, 836 N.W.2d 127, 147–48 (Iowa 2013); *Smidt v. Porter*, 695 N.W.2d 9, 14 & n.1 (Iowa 2005); *see also Nelson v. James H. Knight DDS, P.C.*, 834 N.W.2d 64, 67 (Iowa 2013) (applying the a-motivating-factor standard at summary judgment). The majority does not contest that point, and its characterization of the parties' arguments does not change our precedent.

framework for intentional discrimination." 836 N.W.2d 127, 147 (Iowa 2013) (footnote omitted). So if *Smidt* and *Jones* stand for anything relevant here, it is that we will apply the standard invoked by the plaintiff.

In *McQuistion v. City of Clinton*, we did adopt a version of *McDonnell Douglas*, but the case turned on statutory interpretation of a different provision than the one at issue in this case. 872 N.W.2d 817, 828 (Iowa 2015). In *McQuistion*, the plaintiff brought a pregnancy discrimination claim under Iowa Code section 216.6(2), the provision the legislature enacted to specifically address pregnancy discrimination. *Id.* at 821, 825. We found a similarity in the statutory language with the *McDonnell Douglas* framework and decided that the legislature intended *McDonnell Douglas* to apply under that statutory provision. *Id.* at 828. The language upon which we relied in *McQuistion* is wholly absent from the provision under which Hedlund brings his claim. *Compare* Iowa Code § 216.6(1)(*a*) (age discrimination), *with id.* § 216.6(2) (pregnancy discrimination). Thus, the holding in *McQuistion* has nothing to do with Hedlund's claim.

Finally, the *Landals v. George A. Rolfes Co.* case came before us after a jury verdict. 454 N.W.2d 891, 892 (Iowa 1990). We reviewed the denial of the employer's motions for new trial and judgment notwithstanding the verdict. *Id.* The instructions in *Landals* were not challenged on appeal, and we considered only the sufficiency of the evidence at trial based upon the instructions given. *Id.* We said, "When a case is fully tried on the merits, 'we focus our attention on the ultimate question presented and not on the adequacy of a party's showing at any particular stage of the analysis.'" *Id.* at 893 (quoting *Smith v. Goodyear Tire & Rubber Co.*, 895 F.2d 467, 471 (8th Cir. 1990)). Thus, *Landals* had nothing to do with the proper standard on summary judgment.

On the other hand, in *Nelson v. James H. Knight DDS, P.C.*, the plaintiff claimed that because gender was "a motivating factor" in her discharge from employment, the district court erred in granting summary judgment for the defense. 834 N.W.2d 64, 67 (Iowa 2013). In our analysis, we stated, "Generally, an employer engages in unlawful sex discrimination when the employer takes adverse employment action against an employee and sex is a motivating factor in the employer's decision." *Id.* Later in the opinion, we referred to the a-motivating-factor test in our analysis of the plaintiff's claim that summary judgment was improperly granted. *Id.* at 71. There is no mention at all of *McDonnell Douglas* in this summary judgment case under the ICRA.

While our summary judgment cases may not uniformly reject the application of *McDonnell Douglas* under the ICRA, when a defendant seeks summary judgment in a mixed-motive case, we have removed the underpinnings of such a rule. First, we have long and repeatedly held that there is no difference in Iowa law between direct and circumstantial evidence. *See, e.g., State v. Tipton*, 897 N.W.2d 653, 692 (Iowa 2017); *State v. Bentley*, 757 N.W.2d 257, 262 (Iowa 2008); *Walls v. Jacob North Printing Co.*, 618 N.W.2d 282, 285 (Iowa 2000) (en banc); *Schermer v. Muller*, 380 N.W.2d 684, 687 (Iowa 1986); *Beck v. Fleener*, 376 N.W.2d 594, 597 (Iowa 1985) (en banc); *State v. O'Connell*, 275 N.W.2d 197, 205 (Iowa 1979) (en banc). Thus, we long ago crossed the *Desert Palace* bridge rejecting the distinction between direct and indirect evidence.

Further, in Iowa, the causation standard at trial is "a motivating factor," which is, in substance, the test under *Price Waterhouse*, 490 U.S. at 244, 109 S. Ct. at 1787 (plurality opinion). *See Hawkins v. Grinnell Reg'l Med. Ctr.*, ___ N.W.2d ___, ___ (Iowa 2019) (reaffirming adoption of *Price Waterhouse* a-motivating-factor standard for employment

discrimination claims under the ICRA); *DeBoom v. Raining Rose, Inc.*, 772 N.W.2d 1, 13–14 (Iowa 2009) (adopting the a-motivating-factor standard for status-based discrimination-in-employment claims under the ICRA).[13]

As we clarified in *Hawkins*, there is no burden-shifting component inherent in the legal test for an employment discrimination claim under the ICRA. ___ N.W.2d at ___. This is because, under Iowa law, all defenses must be pled and proved. Iowa R. Civ. P. 1.421(1); *see Price Waterhouse*, 490 U.S. at 244–45, 109 S. Ct. at 1787–88 (holding employer can avoid finding of liability only by proving the same-decision defense); *Ostad v. Or. Health Scis. Univ.*, 327 F.3d 876, 884–85 (9th Cir. 2003) (characterizing same-decision defense as an affirmative defense); *Haskenhoff v. Homeland Energy Sols., LLC*, 897 N.W.2d 553, 627–28 (Iowa 2017) (majority opinion of Appel, J., which was joined by Chief Justice Cady, and Justices Wiggins

---

[13]We apply the *Price Waterhouse* a-motivating-factor test in ICRA employment discrimination cases regardless of the particular protected characteristic at issue. Thus, for example, we would apply the a-motivating-factor test to a race- or sex-discrimination-in-employment case as well as to an age-discrimination-in-employment case. This is inconsistent with federal law, which does not apply the a-motivating-factor test to age-discrimination-in-employment or retaliation-in-employment cases. *See Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352, 133 S. Ct. 2517, 2528 (2013) (applying different standard in federal retaliation-in-employment cases); *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176, 129 S. Ct. 2343, 2350 (2009) (applying different standard in federal age-discrimination-in-employment cases). Our application of the a-motivating-factor test differs from federal law because Iowa prohibits age discrimination in employment in the same statutory provision as it prohibits employment discrimination based on protected traits such as race or sex, unlike the federal statutes. *Compare* 29 U.S.C. § 623(a) (2012) (prohibiting age discrimination in employment), *and* 42 U.S.C. § 2000e–2(a) (prohibiting discrimination in employment because of "race, color, religion, sex, or national origin"), *with* Iowa Code § 216.6(1) (prohibiting discrimination in employment because of, *inter alia*, age, race, or sex). Additionally, our provisions prohibiting status-based and retaliation-based discrimination use the same language, unlike the federal statutes. *Compare* 42 U.S.C. § 2000e–2(a) (status-based discrimination), *and id.* § 2000e–3(a) (retaliation), *with* Iowa Code § 216.6(1) (status-based discrimination), *and id.* § 216.11(2) (retaliation).

One exception to our general practice is pregnancy-discrimination-in-employment cases. *See McQuistion*, 872 N.W.2d at 828. But as discussed above, this exception is due to the different language in the ICRA's pregnancy-discrimination-in-employment provision. *Id.*

and Hecht) (same). Further, nothing in the ICRA imposes a burden-shifting framework, unlike the Federal Civil Rights Act, which codified such a framework. *See* 42 U.S.C. § 2000e–5(g)(2) (2012); *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 349, 133 S. Ct. 2517, 2526 (2013) (acknowledging codification of burden-shifting framework).

Thus, to establish employment discrimination under the ICRA at trial, the plaintiff must prove by a preponderance of the evidence that he or she was subjected to an adverse employment action because of his or her protected characteristic. *See Hawkins*, ___ N.W.2d at ___. However, the plaintiff cannot recover damages for the employer's violation of the ICRA if the employer successfully pleads and proves the same-decision affirmative defense. *Id.*

Having established the a-motivating-factor test as the proper trial standard, it follows that the same standard should apply in a motion for summary judgment on the same claim. At the summary judgment stage of the proceeding, we do not weed out claims by inventing a new, different standard than that which would be applicable at trial. *See, e.g., Stevens v. Iowa Newspapers, Inc.*, 728 N.W.2d 823, 830 (Iowa 2007) (noting that summary judgment must be decided by reference to the evidentiary standard at trial); *Bitner v. Ottumwa Cmty. Sch. Dist.*, 549 N.W.2d 295, 300 (Iowa 1996) (same); *Hike v. Hall*, 427 N.W.2d 158, 159 (Iowa 1988) (same); *Junkins v. Branstad*, 421 N.W.2d 130, 132 (Iowa 1988) (en banc) (same); *Kapadia v. Preferred Risk Mut. Ins.*, 418 N.W.2d 848, 849–50 (Iowa 1988) (same); *Behr v. Meredith Corp.*, 414 N.W.2d 339, 341 (Iowa 1987) (same) (en banc). The proper inquiry is "whether a reasonable jury, faced with the evidence presented, could return a verdict for the nonmoving party." *Bitner*, 549 N.W.2d at 300; *accord Clinkscales v. Nelson Sec., Inc.*, 697 N.W.2d 836, 841 (Iowa 2005) (per curiam). Where the record taken

as a whole could lead a rational tier of fact to find for the nonmoving party, there is a genuine issue for trial. *Clinkscales*, 697 N.W.2d at 841; *Bitner*, 549 N.W.2d at 300. The United States Supreme Court explains,

> Whether a jury could reasonably find for either party . . . cannot be defined except by the criteria governing what evidence would enable the jury to find for either the plaintiff or the defendant: It makes no sense to say that a jury could reasonably find for either party without some benchmark as to what standards govern its deliberations and within what boundaries its ultimate decision must fall, and these standards and boundaries are in fact provided by the applicable evidentiary standards.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254–55, 106 S. Ct. 2505, 2513 (1986).

Thus, the substantive evidentiary standard for whether a jury verdict can be sustained must be the same standard at the motion for summary judgment stage of a proceeding. The only reason for a higher or different standard at the summary judgment stage would be to weed out claims that a rational jury could find meritorious. There is no basis for showing such distrust of juries or hostility toward civil rights actions and empowering judges to prevent potentially meritorious claims from going to trial. *See, e.g.*, *Clinkscales*, 697 N.W.2d at 841 ("Mere skepticism of a plaintiff's claim is not a sufficient reason to prevent a jury from hearing the merits of a case."). Indeed, imposing a higher or different standard at summary judgment than would be applied at trial raises severe issues regarding the right to a jury trial under the State and Federal Constitutions.

Consequently, the analysis on a defendant-employer's motion for summary judgment on the plaintiff's age-discrimination-in-employment claim under the ICRA focuses on whether there is a genuine issue of material fact that the plaintiff's age was a motivating factor in the adverse

employment action. This summary judgment analysis does not, as the district court in this case thought, involve any burden shifting that requires the employer to articulate a legitimate, nondiscriminatory reason for the decision or the plaintiff to then "present evidence sufficient to raise a question of material fact as to whether [the defendants'] proffered reason was pretextual and to create a reasonable inference that [the protected characteristic] was a determining factor in the adverse employment action."

Ordinarily, "[i]f we find an incorrect legal standard was applied, we remand for new findings and application of the correct standard." *State v. Robinson*, 506 N.W.2d 769, 770–71 (Iowa 1993); *see Papillon v. Jones*, 892 N.W.2d 763, 773 (Iowa 2017). But in light of the majority's affirmance of summary judgment, I proceed to consider the merits of whether the defendants were entitled to summary judgment on Hedlund's age discrimination claim under the proper framework.

**C.  Discussion of Summary Judgment.** I begin with a brief review of the generally applicable rules related to motions for summary judgment.

"To obtain summary judgment, 'the moving party must affirmatively establish the existence of undisputed facts entitling that party to a particular result under controlling law.' " *K & W Elec., Inc. v. State*, 712 N.W.2d 107, 112 (Iowa 2006) (quoting *Griglione v. Martin*, 525 N.W.2d 810, 813 (Iowa 1994), *overruled on other grounds by Winger v. CM Holdings, L.L.C.*, 881 N.W.2d 433, 448 (Iowa 2016)). The burden of showing undisputed facts entitling the moving party to summary judgment rests with the moving party. *Castro v. State*, 795 N.W.2d 789, 792 (Iowa 2011).

A court examining the propriety of summary judgment must "view the entire record in the light most favorable to the nonmoving party." *Bass v. J.C. Penney Co.*, 880 N.W.2d 751, 755 (Iowa 2016). The court must also

indulge "on behalf of the nonmoving party every legitimate inference reasonably deduced from the record," *Bagelmann v. First Nat'l Bank*, 823 N.W.2d 18, 20 (Iowa 2012) (quoting *Van Fossen v. MidAm. Energy Co.*, 777 N.W.2d 689, 692 (Iowa 2009)), "in an effort to ascertain the existence of a fact question," *Crippen v. City of Cedar Rapids*, 618 N.W.2d 562, 565 (Iowa 2000) (en banc). "Even if the facts are undisputed, summary judgment is not proper if reasonable minds could draw different inferences from them and thereby reach different conclusions." *Banwart v. 50th St. Sports, L.L.C.*, 910 N.W.2d 540, 544–45 (Iowa 2018) (quoting *Clinkscales*, 697 N.W.2d at 841).

"Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts" are functions for the jury, not a judge ruling on a summary judgment motion. *Carr v. Bankers Tr. Co.*, 546 N.W.2d 901, 905 (Iowa 1996) (quoting *Anderson*, 477 U.S. at 255, 106 S. Ct. at 2513). In ruling "[o]n a motion for summary judgment, the court does not weigh the evidence. Instead, the court inquires whether a reasonable jury, faced with the evidence presented, could return a verdict for the nonmoving party." *Bitner*, 549 N.W.2d at 300; *accord Clinkscales*, 697 N.W.2d at 841.

Further, discrimination cases often involve questions of intent and causation. Both these elements are traditionally not amenable to summary judgment. *Thompson v. Kaczinski*, 774 N.W.2d 829, 836 (Iowa 2009) (causation); *Hoefer v. Wis. Educ. Ass'n Ins. Tr.*, 470 N.W.2d 336, 338 (Iowa 1991) (en banc) (motive and intent). *See generally Sherwood v. Nissen*, 179 N.W.2d 336, 339 (Iowa 1970) ("Some ultimate facts lend themselves more readily to categorical proof than others. A plaintiff suing on a note is usually in a considerably different position than a plaintiff suing for negligence."). Thus,

> [a]s a general matter, the plaintiff in an employment discrimination action need produce very little evidence in order to overcome an employer's motion for summary judgment. This is because "the ultimate question is one that can only be resolved through a searching inquiry—one that is most appropriately conducted by a factfinder, upon a full record."

*Chuang v. Univ. of Calif. Davis, Bd. of Trs.*, 225 F.3d 1115, 1124 (9th Cir. 2000) (quoting *Schnidrig v. Columbia Mach., Inc.*, 80 F.3d 1406, 1410 (9th Cir. 1996)).

Following the applicable rules of not making credibility determinations, not weighing the evidence, and drawing all legitimate inferences in favor of the nonmoving party, I conclude there is a genuine issue of material fact that Hedlund's age was a motivating factor in his discharge. "A motivating factor is one that helped compel the decision," *Haskenhoff*, 897 N.W.2d at 602 (Cady, C.J., concurring in part and dissenting in part), or that "played a part" or "a role" in the employer's decision, *e.g.*, *Boyd v. Ill. State Police*, 384 F.3d 888, 895 (7th Cir. 2004) (approving "played a part or a role" language); Model Civil Jury Instructions for the District Courts of the Eighth Circuit 5.21, 5.40 (2018); *see DeBoom*, 772 N.W.2d at 13 (approving "played a part" language); *see also Estes v. Dick Smith Ford, Inc.*, 856 F.2d 1097, 1101 (8th Cir. 1988) ("[A]n employer violates Title VII whenever an unlawful motive has *played some part* in an adverse employment decision, even when the employer was also motivated by lawful considerations which would have dictated the same decision." (Emphasis added.)), *abrogated on other grounds by Price Waterhouse*, 490 U.S. at 241–42, 109 S. Ct. at 1786, *as recognized in Dindinger v. Allsteel, Inc.*, 853 F.3d 414, 424–25 (8th Cir. 2017). It is a factor that "moves" or "pushes" the defendant toward the challenged decision. *See, e.g., Price Waterhouse*, 490 U.S. at 241, 190 S. Ct. at 1786 (providing illustration of "[s]uppose two physical forces act upon and *move*

an object" (emphasis added)); *Hasan v. U.S. Dep't of Labor*, 400 F.3d 1001, 1006 (7th Cir. 2005) ("A motivating factor is a factor that weighs in the defendant's decision to take the action complained of—in other words, it is a consideration present to his mind that favors, that *pushes* him toward, the action." (Emphasis added.)). It has also been defined as a factor the employer "relied upon" in reaching the decision. *Price Waterhouse*, 490 U.S. at 241–42, 109 S. Ct. at 1786.

But, importantly, a motivating factor is not necessarily *the* reason for the decision.[14] *DeBoom*, 772 N.W.2d at 13 (noting plaintiff in a discrimination case need only demonstrate that "his or her status as a member of a protected class was *a* [not *the*] determining factor in the decision to terminate employment"); *accord Price Waterhouse*, 490 U.S. at 250, 109 S. Ct. at 1790 ("In saying that gender played a motivating part in an employment decision, we mean that, if we asked the employer at the moment of the decision what its reasons were and if we received a truthful response, *one of those reasons* would be that the applicant or employee was a woman." (Emphasis added.)); *Hasan*, 400 F.3d at 1006 ("[A motivating factor] is a, not necessarily the, reason that [the employer] takes the action."); *Boyd*, 384 F.3d at 895 ("[T]here is a difference between a motivating factor, and a single factor that is the precipitating force (one definition of catalyst) for an action."). Furthermore, "[i]ts precise weight in [the employer's] decision is not important." *Haskenhoff*, 897 N.W.2d at 602 (quoting *Hasan*, 400 F.3d at 1006).

Hedlund offered evidence that comments arguably related to his age were made by a manager prior to his ultimate termination. First, he stated

---

[14]The majority "affirm[s] the district court's determination that plaintiff failed to present sufficient evidence from which a reasonable jury could infer age discrimination was the real reason for his termination." But this misunderstands Hedlund's claim, which, as he explains, seeks "to prove that age was *a* motivating factor not *the* motivating factor."

that Meyers, his direct supervisor, made two or three references to Hedlund being "in the twilight of his career" during a February 15, 2013 meeting. The purpose of that meeting was to provide Hedlund with verbal counseling regarding his email communication, specifically with respect to Hedlund's February 12, 2013 email to Meyers wherein he voiced his concerns with some of Meyers's management tactics. Thus, Hedlund's proximity to retirement from the department of public safety (DPS) was irrelevant.[15] Later that month, Meyers conducted a phone call with Hedlund and another employee and repeatedly asked them when they were going to retire. These comments were made by Meyers, Hedlund's immediate supervisor, not some coemployee. *Cf. Santiago-Ramos v. Centennial P.R. Wireless Co.*, 217 F.3d 46, 55 (1st Cir. 2000) ("Typically, statements made by 'one who neither makes nor influences [a] challenged personnel decision are not probative in an employment discrimination case.' " (Alteration in original.) (quoting *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 10 (1st Cir. 1990))). And the remarks were part of the ongoing investigatory and disciplinary process that led to Hedlund's

---

[15]The defendants contend that Meyers made the comments in the context of trying to explain to Hedlund that "he [Meyers] didn't want to have issues with [Hedlund] because [Hedlund] was in the twilight of [his] career" and, therefore, the comments' context demonstrates they were neutral. But that is not the standard for an age-discrimination-in-employment case in Iowa. The standard is whether we can legitimately infer that the comments about an employee being in the twilight of his or her career indicate age was a motivating factor in the discharge decision.

Here, Meyers indicated Hedlund's age and proximity to retirement were part of his decision on how to handle any perceived issues with Hedlund's email communication. In essence, Meyers admits that age played a role in his decision as Hedlund's supervisor. If age played a role in at least one of Meyers's supervisory decisions, even though age was an otherwise irrelevant factor for such a decision, then it is reasonable to infer age played an improper role in other supervisory actions taken by Meyers. *See Alphin v. Sears, Roebuck & Co.*, 940 F.2d 1497, 1498–99, 1500–01 (11th Cir. 1991) (finding remark by supervisor to plaintiff that he had "been around too long and [was] too old and [was] making too much money" *immediately after a corrective interview* was circumstantial evidence of age discrimination).

termination in July of 2013. *See, e.g.*, *Leonard v. Twin Towers*, 6 F. App'x 223, 230 (6th Cir. 2001) ("[W]e must carefully examine the nature of the inquiries and the context in which that inquiry was made.").

The district court characterized Meyers's comments as "stray comments."[16] There are a number of problems with this conclusory label. The remarks here were made by a manager during the process that ultimately led to Hedlund's termination. *Cf. Price Waterhouse*, 490 U.S. at 277, 109 S. Ct. at 1804–05 (O'Connor, J., concurring in the judgment) (noting stray comments are those made by nondecisionmakers or "by decisionmakers unrelated to the decisional process itself"). The comments were not watercooler talk or lunch room chatter with coemployees who had a friendly interest in Hedlund's plans. Nor were they made for a legitimate business purpose, such as planning for the future. *See, e.g.*, *Killingsworth v. State Farm Mut. Auto. Ins.*, 254 F. App'x 634, 637 (9th Cir. 2007) (finding, based on the facts of the particular case, that the employer's inquiries into

---

[16]The "stray comments" or "stray remarks doctrine" arose from Justice O'Connor's concurring opinion in *Price Waterhouse*. *See generally, e.g.*, *Diaz v. Jiten Hotel Mgmt., Inc.*, 762 F. Supp. 2d 319, 333–38 (D. Mass. 2011); 1 Merrick T. Rossein, *Employment Discrimination Law and Litigation* § 2:16.10 (2018), Westlaw EMPLL; Kerri Lynn Stone, *Taking in Strays: A Critique of the Stray Comment Doctrine in Employment Discrimination Law*, 77 Mo. L. Rev. 149, 149–73 (2012) [hereinafter Stone]. In her *Price Waterhouse* concurrence, Justice O'Connor noted that "statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process itself" cannot constitute direct evidence of discrimination for purposes of a mixed-motive analysis. *Price Waterhouse*, 490 U.S. at 277, 109 S. Ct. at 1804–05 (O'Connor, J., concurring in the judgment).

However, the continued validity, scope, and breadth of the doctrine has been widely criticized. *See, e.g.*, *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 229 (5th Cir. 2000) ("[T]he 'stray remark' jurisprudence is itself inconsistent with the deference appellate courts traditionally allow juries regarding their view of the evidence presented and so should be narrowly cabined." (quoting *Vance v. Union Planters Corp.*, 209 F.3d 438, 442 n.4 (5th Cir. 2000))); *Diaz*, 762 F. Supp. 2d at 333–34 (noting the doctrine "began as a debate about what comprised 'direct evidence' in mixed-motive cases (a test no longer required even in mixed motive cases)"); Stone, 77 Mo. L. Rev. at 152. And the Supreme Court itself has declined to apply the doctrine in an overly broad or strict sense. *See, e.g.*, *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 152–54, 120 S. Ct. 2097, 2111–12 (2000).

its employees' retirement plans were part of a legitimate business interest in planning for its own future).  The comments were made as part of a management process directly related to Hedlund's job and were made by the manager who participated in the termination decision.  *See Underwood v. Monroe Mfg., L.L.C.*, 434 F. Supp. 2d 680, 689 (S.D. Iowa 2006) ("The speaker [of the comments or inquiries] should have a sufficient connection to the decisionmaking process.").  Although the ultimate decision to terminate was made by Paulson, Meyers had input on the decision.  *See, e.g.*, *Hunt v. City of Markham*, 219 F.3d 649, 652–53 (7th Cir. 2000) (noting when those who have input into the adverse employment decision express discriminatory feelings around the relevant time of the decision, "then it may be possible to infer that the decision makers were influenced by those feelings in making their decision").

The federal caselaw indicates that "repeated," "unnecessary," or "excessive" inquiries into an employee's retirement plans may be relevant to an age discrimination claim.  *See, e.g.*, *Cox v. Dubuque Bank & Tr. Co.*, 163 F.3d 492, 498 (8th Cir. 1998) ("unnecessary" and "excessive"); *Guthrie v. J.C. Penney Co.*, 803 F.2d 202, 208 (5th Cir. 1986) ("repeated" and "unnecessary").  At least one case posits that

> [i]f a manager makes an ageist remark, it could well be a window on his soul, a reflection of his animus, or arguably, just a slip of the tongue . . . .  The inference to be given the remark should not be made by judges, particularly judges who have not heard the entire story.

*Diaz v. Jiten Hotel Mgmt., Inc.*, 762 F. Supp. 2d 319, 323 (D. Mass. 2011); *accord Ryder v. Westinghouse Elec. Corp.*, 128 F.3d 128, 132–33 (3d Cir. 1997) (acknowledging a corporate executive's stray comment can be probative of informal managerial attitudes, which may be circumstantial evidence of discrimination); *cf. Price Waterhouse*, 490 U.S. at 251, 109

S. Ct. at 1791 (plurality opinion) ("[S]tereotyped remarks can certainly be *evidence* that gender played a part [in the employer's decision]."); *Mullen v. Princess Anne Volunteer Fire Co.*, 853 F.2d 1130, 1133 (4th Cir. 1988) (noting the use of racially offensive slurs in the employment context is relevant to whether "a particular decision was made with racial animus").

Here, there were comments from which age discrimination can reasonably be inferred. *See Phillips v. Covenant Clinic*, 625 N.W.2d 714, 717–18 (Iowa 2001) (en banc) ("In ruling on a summary judgment motion, . . . [t]he court must also consider on behalf of the nonmoving party every legitimate inference that can be reasonably deduced from the record."). Comments that an employee is in the twilight of his or her career have been found to support an age discrimination claim. *Forman v. Small*, 271 F.3d 285, 293 (D.C. Cir. 2001); *Theil v. West Mifflin Borough*, No. 2:05-cv-1516, 2007 WL 1087773, at *2 (W.D. Pa. Apr. 9, 2007) (characterizing statements that the plaintiff was "in the twilight of [his] career" as "textbook evidence of direct discrimination under *Price Waterhouse*" (emphasis omitted)); *see Jelinek v. Abbott Labs.*, 843 N.E.2d 807, 814, 817–18 (Ohio Ct. App. 2005) (suggesting a statement that the fifty-three-year-old employee was in "twilight of his career" in a job evaluation could be evidence of age discrimination). And inquiry regarding retirement obviously has potential relevance for an age discrimination claim. *See, e.g., Leonard*, 6 F. App'x at 230 ("[W]e recognize that not all inquiries about retirement are 'friendly' and that repeated and unwelcome inquiries may certainly be relevant to a showing of age discrimination. . . . '[T]he courts must carefully evaluate factors affecting the statement's probative value, such as the declarant's position in the corporate hierarchy, the purpose and content of the statement, and the temporal connection between the statement and the challenged employment

action[.]' " (First and third alterations in original.) (quoting *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 357 (6th Cir. 1998))).

Hedlund presented other evidence of age discrimination. He was fifty-four at the time of termination while his successor was forty-five. This nine-year age difference is circumstantially probative of age discrimination. *See, e.g.*, *Smith v. City of Allentown*, 589 F.3d 684, 689 (3d Cir. 2009). Under the Federal Age Discrimination in Employment Act (ADEA), one element of an age discrimination claim is "that the plaintiff was ultimately replaced by another employee who was sufficiently younger." *Id.*; *cf. Faulkner v. Douglas County*, 906 F.3d 728, 734 (8th Cir. 2018) (stating an element of a Federal ADEA claim is that "substantially younger, similarly situated employees were treated more favorably"). The federal courts have stated, "[T]o satisfy the sufficiently younger standard, 'there is no particular age difference that must be shown.'" *Monaco v. Am. Gen. Assurance Co.*, 359 F.3d 296, 307 (3d Cir. 2004) (quoting *Showalter v. Univ. of Pittsburgh Med. Ctr.*, 190 F.3d 231, 236 (3d Cir. 1999)). Thus, courts have held that four-, five-, eight-, nine-, ten-, fourteen-, and sixteen-year age differences satisfied the sufficiently younger standard. *E.g.*, *Showalter*, 190 F.3d at 236 (eight- and sixteen-year age difference); *Sempier v. Johnson & Higgins*, 45 F.3d 724, 729–30 (3d Cir. 1995) (temporary replacement was over ten years younger and permanent replacement was four years younger); *Douglas v. Anderson*, 656 F.2d 528, 533 (9th Cir. 1981) (five-year age difference); *Cridland v. Kmart Corp.*, 929 F. Supp. 2d 377, 385 (E.D. Pa. 2013) (nine- and fourteen-year age differences); *see O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 312–13, 116 S. Ct. 1307, 1310 (1996) (suggesting replacement would be sufficiently younger if there was a sixteen-year age difference). Although there is no requirement that the plaintiff was replaced by someone

sufficiently younger under the ICRA, the federal standard and caselaw suggest age discrepancy between the plaintiff and his or her replacement is indicative of age discrimination.

Finally, Hedlund claims that in the selection of his successor, there was evidence of age discrimination. The person ultimately hired was forty-five years in age while other applicants were somewhat older. Hedlund offered evidence suggesting that the older applicants were scored and considered less favorably than the younger applicants. *See Forman*, 271 F.3d at 292 (noting evidence that people under a certain age had a higher rate of promotion than those over a certain age was relevant to an age discrimination claim); *Guthrie*, 803 F.2d at 208 (finding the scoring discrepancies between the plaintiff and younger employees for the same problems was probative of discrimination); *cf. Faulkner*, 906 F.3d at 734 (stating an element of a Federal ADEA claim is that "substantially younger, similarly situated employees were treated more favorably"). Considered in isolation, this evidence would have limited probative value; however, when considered in context with Hedlund's other circumstantial evidence of age discrimination, this correlation has greater probative value. *Cf. Leonard*, 6 F. App'x at 230 ("[W]e do not view each discriminatory remark in isolation, but are mindful that the remarks buttress one another as well as any other pretextual evidence supporting an inference of discriminatory animus." (quoting *Ercegovich*, 154 F.3d at 356)).

Yet, on balance, we should trust juries to sort out factual disputes. *See, e.g., Mora v. Jackson Mem'l Found., Inc.*, 597 F.3d 1201, 1204 (11th Cir. 2010) (per curiam) (denying summary judgment where a reasonable juror could accept that the employer made the "discriminatory-sounding remarks" and "[t]he resolution of th[e] case depend[ed] on whose account of the pertinent conversations a jury would credit"); *Merkle v. Upper Dublin*

*Sch. Dist.*, 211 F.3d 782, 795 (3d Cir. 2000) ("Where a reasonable inference can be drawn that an employee's [engagement in a protected activity] was at least one factor considered by an employer in deciding whether to take action against the employee, the question of whether the [engagement in the protected activity] was a motivating factor in that determination is best left to the jury."); *Heiat v. E. Mont. Coll.*, 912 P.2d 787, 792 (Mont. 1996) (plurality opinion) ("The District Court determined that although Nafisseh had established a prima facie case of sex discrimination, EMC had established a legitimate nondiscriminatory reason for the salary disparity between Abbas and Nafisseh. The District Court determined that the differences in the salaries were based on factors other than sex. However, in making this determination, the District Court adjudicated the disputed issue of material fact as to the reason for the differences in the salaries. . . . [T]his factual determination of motive or intent is precisely the reason that summary judgment is generally inappropriate in discrimination cases. Where different ultimate inferences may be drawn from the evidence presented by the parties, the case is not one for summary judgment.").

In my view, there is enough here—the hiring of a younger person, the correlation evidence of less favorable consideration the older the applicant, and comments by a person in the decisionmaking loop—to survive summary judgment. *See Ryder*, 128 F.3d at 133 (noting it is for the factfinder to decide how much weight should be given to a corporate executive's stray comment as circumstantial evidence of age discrimination); *Guthrie*, 803 F.2d at 208 (deferring to the jury's credibility determinations of testimony evidence).[17]

---

[17]Further, even under the *McDonnell Douglas* standard, I would find Hedlund's age discrimination claim survives summary judgment. Under the *McDonnell Douglas* framework, the plaintiff must first establish a prima facie case of discrimination. *Reeves*, 530 U.S. at 142, 120 S. Ct. at 2106. Thus, Hedlund must show (1) he was a member of

In employment discrimination cases, I think it is important that appellate judges not act as superjurors. *See generally* Sandra F. Sperino & Suja A. Thomas, *Unequal: How America's Courts Undermine Discrimination Law* at 19–23 (2017). There is rarely documentary evidence or other blatant evidence available showing intentional discrimination. As a result, a number of courts have called for an added measure of "rigor,"

---

a class protected by the ICRA (i.e., an employee who cannot be discriminated against in his employment because of his age), (2) he was otherwise qualified for his position, and (3) his termination occurred under circumstances giving rise to an inference of discrimination. *See* Iowa Code § 216.6(1); *Farmland Foods, Inc. v. Dubuque Human Rights Comm'n*, 672 N.W.2d 733, 741 n.1 (Iowa 2003) (identifying three basic elements of a prima facie case of discrimination in employment); *Smidt*, 695 N.W.2d at 14 (identifying three prima facie case elements for pregnancy discrimination in employment under the ICRA); *cf. Reeves*, 530 U.S. at 142, 120 S. Ct. at 2106 (identifying similar prima facie case elements for a claim under the Federal ADEA). Hedlund met this initial, minimal burden of production. *See Reeves*, 530 U.S. at 142, 120 S. Ct. at 2106 (indicating the *McDonnell Douglas* standard is a test for the burden of production, not a burden of persuasion); *Smidt*, 695 N.W.2d at 14–15 (noting the prima facie case showing is a "minimal requirement")

Under *McDonnell Douglas*, the burden of production then shifts to the defendants to provide evidence showing Hedlund was terminated for a legitimate, nondiscriminatory reason. *See Reeves*, 530 U.S. at 142, 120 S. Ct. at 2106; *Smidt*, 695 N.W.2d at 15. "This burden is one of production, not persuasion; it 'can involve no credibility assessment.' " *Reeves*, 530 U.S. at 142, 120 S. Ct. at 2106 (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509, 133 S. Ct. 2742, 2748 (1993)). The defendants met this burden by offering evidence that Hedlund was terminated because of his poor performance and demeanor.

Finally, under *McDonnell Douglas*, the burden shifts back to Hedlund to "show the employer's reason was pretextual and that unlawful discrimination was the real reason for the termination." *Smidt*, 695 N.W.2d at 15; *see Reeves*, 530 U.S. at 142–43, 120 S. Ct. at 2106. At this point, "[t]he question, after all, is simply whether [Hedlund] has introduced sufficient admissible evidence from which a rational trier of fact could find [the defendants'] alleged reasons for [his] termination were false, and intentional discrimination was the real reason." *Smidt*, 695 N.W.2d at 15. I believe a rational trier of fact could find the defendants proffered reasons were pretextual based on the same circumstantial evidence that supports a finding that Hedlund's age was a motivating factor in the defendants' decision: Meyers's irrelevant and unnecessary comments on Hedlund being in the twilight of his career and inquiries into when Hedlund was planning to retire, the nine-year age difference between Hedlund and his successor, and the correlation of less favorable consideration of the older applicants for Hedlund's position. *See Desert Palace*, 539 U.S. at 98–102, 123 S. Ct. at 2153–55 (stating direct evidence of discrimination is not required and explaining why). Therefore, even under the *McDonnell Douglas* standard, I would conclude Hedlund has met his burden of production to survive summary judgment.

"caution," or "special caution" in ruling on summary judgment in discrimination cases. *See Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d 1219, 1224 (2d Cir. 1994); *McCoy v. WGN Cont'l Broad. Co.,* 957 F.2d 368, 370–71 (7th Cir. 1992); *Hayes v. Shalala,* 902 F. Supp. 259, 263 (D.D.C. 1995) ("Summary judgment in discrimination cases must be approached with special caution and the Court 'must be extra-careful to view all the evidence in the light most favorable' to plaintiff." (quoting *Ross v. Runyon,* 859 F. Supp. 15, 22 (D.D.C. 1994))).

Yet, as has been repeatedly noted in the literature, courts often are very aggressive in granting summary judgment in civil rights cases. Theresa M. Beiner, *Let the Jury Decide: The Gap Between What Judges and Reasonable People Believe Is Sexually Harassing,* 75 S. Cal. L. Rev. 791, 846 (2002) ("Courts often judge harassment incorrectly, granting summary judgment or judgment as a matter of law in questionable cases given what social science tells about people's perceptions of harassment."); Ann C. McGinley, *Credulous Courts and the Tortured Trilogy: The Improper Use of Summary Judgment in Title VII and ADEA Cases,* 34 B.C. L. Rev. 203, 255–56 (1993) (concluding too many courts "weigh evidence, draw inferences in favor of the defendant when it moves for summary judgment, assess witness credibility and require plaintiffs to prove their cases at the summary judgment stage"); Elizabeth M. Schneider, *The Dangers of Summary Judgment: Gender and Federal Civil Litigation,* 59 Rutgers L. Rev. 705, 775–76 (2007) (noting the challenge of keeping summary judgment within proper bounds in gender discrimination cases); Suja A. Thomas, *Summary Judgment and the Reasonable Jury Standard: A Proxy for a Judge's Own View of the Sufficiency of the Evidence?,* 97 Judicature 222, 227 (2014) ("[J]udges may fall prey to their own opinions of evidence upon motions for summary judgment . . . ."). The refusal of courts to allow civil

rights cases to proceed to trial has so frustrated one Iowa jurist with four decades of experience that he has called for the abolition of motions for summary judgment altogether. Mark W. Bennett, Essay, *From the "No Spittin', No Cussin' and No Summary Judgment" Days of Employment Discrimination Litigation to the "Defendant's Summary Judgment Affirmed Without Comment" Days: One Judge's Four-Decade Perspective*, 57 N.Y. L. Sch. L. Rev. 685, 715–16 (2012–2013).

We should approach summary judgment in this case, and in every case, with great caution. We should carefully examine the facts and ask ourselves with self-critical rigor and discipline the following: Have we refused to engage in credibility determinations? Have we refused to weigh the evidence? Have we given every legitimate inference of the meaning of evidence to the nonmoving party? And then we must apply the evidence against the relatively low a-motivating-factor standard. Applying these principles in this case, I believe that the defendants' motion for summary judgment should have been denied.

**D. Defendants' Check-the-Box Argument.** The defendants also argue they are entitled to summary judgment on Hedlund's age discrimination claim because Hedlund failed to exhaust his administrative remedies. Specifically, they contend Hedlund did not give notice of all of his civil rights claims in his Iowa Civil Rights Commission (ICRC) complaint because, on the complaint form, he checked the boxes for "Disciplined/Suspended" and "Terminated" but not the box for "Forced to Quit/Retire." Because the majority concludes Hedlund did not present sufficient evidence to survive summary judgment, it does not need to address this argument. However, I write to identify the fallacies of the defendants' claim.

On July 17, 2013, Hedlund received a document with the heading "TERMINATION." The document cited various rule violations and concluded, "Effective July 17, 2013, your employment with the Iowa Department of Public Safety is terminated." The document further stated, "You may appeal this action in accordance with Iowa Code Section 80.15."

Iowa Code section 80.15 provides a peace officer with an opportunity, at the peace officer's request, for a hearing before the Employment Appeal Board (EAB). The statute states that the peace officer "is not subject to dismissal" during the pendency of the appeal.

After receiving the document entitled TERMINATION, Hedlund filed an appeal with the EAB pursuant to section 80.15. Prior to the scheduled hearing, however, Hedlund dismissed the appeal. DPS then notified Hedland that "the effective date of your termination from employment with the Department of Public Safety will be Thursday, January 30, 2014." One day prior to the new effective date of his termination, Hedlund elected to retire from the department in order to be able to use his banked sick leave to pay for state health insurance benefits.

Even if it would have been more accurate to check the "Forced to Quit/Retire" box on the civil rights form, the civil rights commission was informed that Hedlund claimed he was discriminated against in employment because of his age. Further, the respondent-employer knew exactly what the process was leading up to Hedlund's departure. This was not a case where the employee hid the ball and later tried to resurrect a claim that was never presented to the commission in the first place and deprived the employer of an opportunity to defend. *Cf. McElroy v. State*, 703 N.W.2d 385, 390–91 (Iowa 2005) (finding the plaintiff did not exhaust her administrative remedies on her retaliation claim because (1) on her ICRC complaint form, she checked only the box labeled "sex" but not the

box labeled "retaliation" and she did not describe any acts of retaliation in her complaint's narrative, and (2) the ICRC specifically noted the only issue was the alleged sex discrimination in employment).

Also compelling is the fact that Iowa Code chapter 216 does not distinguish between age-discrimination-in-employment claims that are based on being "[f]orced to [q]uit/[r]etire" and ones that are based on being "[t]erminated." *See* Iowa Code § 216.6(1)(*a*); *see also Haskenhoff*, 897 N.W.2d at 603 ("A constructive *discharge* occurs 'when the employer deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation.' " (Emphasis added.) (quoting *Van Meter Indus. v. Mason City Human Rights Comm'n*, 675 N.W.2d 503, 511 (Iowa 2004))). Indeed, section 216.6(1)(*a*) does not use the terms *terminate*, *force to quit*, or *force to retire*. Rather, section 216.6(1)(*a*) makes it unlawful to "*discharge* any employee" or to "*otherwise discriminate* in employment against . . . any employee because of [the employee's] age." Comparatively, the ICRC complaint form does not have a box to check for being "discharge[d]," which could reasonably mean being terminated, forced to quit, forced to resign, laid-off, among other possible actions listed on the ICRC complaint form.

Moreover, the substantive elements of an age-discrimination-in-employment claim are no different if the claim derives from termination or being forced to retire. Hedlund must still prove (1) he is a member of a particular protected class—age, (2) he was qualified to do his job, and (3) he suffered an adverse employment decision because of his particular protected characteristic—age. *See, e.g., Deeds v. City of Marion*, 914 N.W.2d 330, 339 (Iowa 2018) (setting out same three elements as basis for a discrimination-in-employment case based on disability); *DeBoom*, 772 N.W.2d at 6–7, 13–14 (setting out elements of pregnancy-discrimination-

in-employment claim under the ICRA similarly and adopting *Price Waterhouse*'s a-motivating-factor standard for causation); *Vaughan v. Must, Inc.*, 542 N.W.2d 533, 538–39 (Iowa 1996) (identifying similar elements for a Federal ADEA claim using the *Price Waterhouse* standard for causation).    Whether the adverse employment action was being terminated or being forced to quit, the alleged end result is Hedlund was "discharge[d]" from his employment because of his age, which is ultimately all that section 216.6(1)(*a*) requires.[18]

We have acknowledged that "[a] plaintiff will be deemed to have exhausted administrative remedies as to allegations contained in a judicial complaint that are like or reasonably related to the substance of charges timely brought before [the administrative agency]." *McElroy*, 703 N.W.2d at 390 (alterations in original) (quoting *Williams v. Little Rock Mun. Water Works*, 21 F.3d 218, 222 (8th Cir. 1994)); *see Huri v. Office of the Chief Judge of the Circuit Ct. of Cook Cty.*, 804 F.3d 826, 831–32 (7th Cir. 2015) ("[T]he relevant claim and the EEOC charge must, at a minimum, describe the same conduct and implicate the same individuals."). Hedlund's allegation that he was discharged from or otherwise discriminated against in his employment because of his age that is contained in his judicial complaint is reasonably related to his ICRC complaint allegations that he was disciplined, suspended, and terminated in his employment because of his age. *See, e.g.*, *Batson v. Salvation Army*, 897 F.3d 1320, 1327 (11th Cir. 2018) ("[T]his Court . . . has noted that judicial claims are allowed if they amplify, clarify, or more clearly focus the allegations in the EEOC

---

[18]Further, Hedlund's situation is distinguishable from a situation where an ICRC complainant checked a box on the complaint form identifying one type of discriminatory employment conduct (discrimination based on her sex), did not check the box for a separate type of discriminatory conduct (retaliatory discrimination), and at trial, tried to pursue a claim based on the "unchecked" type of discriminatory conduct. *See McElroy*, 703 N.W.2d at 390–91.

complaint, but has cautioned that allegations of new acts of discrimination are inappropriate." (Second alteration in original.) (quoting *Gregory v. Ga. Dep't of Human Res.*, 355 F.3d 1277, 1279–80 (11th Cir. 2004) (per curiam))). Additionally, Hedlund was terminated from his employment with the DPS only one time—on July 17, 2013; the *effective date* of that termination is all that changed.[19] Thus, the letter informing Hedlund his termination would become effective on January 30, 2014, was merely a continuation of the adverse employment action Hedlund cited in his ICRC complaint—the decision to terminate him in July 2013.

It is also important to remember that civil rights complaints are often filed by lay persons and the civil rights process is designed to provide an avenue for unrepresented persons to obtain relief. *See Mormann v. Iowa Workforce Dev.*, 913 N.W.2d 554, 568–69 (Iowa 2018); *see also Williams v. Tarrant Cty. Coll. Dist.*, 717 F. App'x 440, 445 (5th Cir. 2018) (per curiam) ("Because administrative charges are 'rarely drawn by an attorney', 'the only absolutely essential element of a timely charge of discrimination is the allegation of fact contained therein.'" (quoting *Sanchez v. Standard Brands, Inc.*, 431 F.2d 455, 463, 467 (5th Cir. 1970))); *Younis v. Pinnacle Airlines, Inc.*, 610 F.3d 359, 362 (6th Cir. 2010) (noting EEOC charges are usually filed by aggrieved employees, not attorneys, so those complaints should be construed liberally). Thus, our exhaustion

---

[19]Hedlund received only one notice of termination, which was dated July 17, 2013. In that notice, under the heading "Action To Be Taken," it said, "Your actions and deportment represent behavior that is unacceptable and warrants discharge." It then continued, "Effective July 17, 2013, your employment with the Iowa Department of Public Safety is terminated."

In contrast, after Hedlund dismissed his appeal to the EAB, he did not receive another official document or communication informing him he was now being terminated. Instead, he received a letter that said, "Pursuant to [your] dismissal [of your EAB appeal] and Iowa Code section 80.15, your *effective date of termination* from employment with the Department of Public Safety will be Thursday, January 30th, 2014." (Emphasis added.).

rules relating to civil rights complaints and the process should not be interpreted or applied in a highly technical manner. *Mormann*, 913 N.W.2d at 570; *McElroy*, 703 N.W.2d at 390 ("[T]he administrative complaint must be construed liberally to further the remedial purposes of the civil rights laws.").

The defendants' check-the-box argument is highly technical and would defeat the purposes of Iowa Code chapter 216. *See Gregory*, 355 F.3d at 1280 (holding the plaintiff exhausted administrative remedies even though she failed to check the retaliation box on the EEOC complaint because the EEOC investigation "would have reasonably uncovered any evidence of retaliation"); *Tarrant Cty. Coll. Dist.*, 717 F. App'x at 445 ("[O]ur court does not require a 'plaintiff [to] check a certain box or recite a specific incantation to exhaust' and will not 'cut off [a party's rights] merely because [s]he fails to articulate correctly the legal conclusion emanating from h[er] factual allegations.' " (Alterations in original.) (first quoting *Pacheco v. Mineta*, 448 F.3d 783, 792 (5th Cir. 2006); and then quoting *Sanchez*, 431 F.2d at 462)); *Spengler v. Worthington Cylinders*, 615 F.3d 481, 490 (6th Cir. 2010) (holding the plaintiff exhausted administrative remedies on his retaliation claim even though he did not check the "Retaliation" box on the EEOC charge because he "clearly set[] forth a retaliation claim in the narrative of the EEOC charge such that both the defendant and the EEOC were on notice of [his] retaliation claim"); *Kristufeh v. Hussmann Foodservice Co., Toastmaster Div.*, 985 F.2d 364, 368 (7th Cir. 1993) (stating simple technicalities such as "[w]hat boxes, for instance, are checked on the EEOC form do not necessarily control the scope of the subsequent civil complaint"); *Noreuil v. Peabody Coal Co.*, 96 F.3d 254, 259 (7th Cir. 1996) (noting when claims are related and intertwined, strict and technical application of forms is inappropriate); *Sw.*

*Convenience Stores, LLC v. Mora*, 560 S.W.3d 392, 401 (Tex. App. 2018) ("[Plaintiff's] claims may include those stated in her charge and factually related claims that could reasonably be expected to fall within the agency's investigation of the claims stated in the charge."); *cf. Mormann*, 913 N.W.2d at 569 ("Strict and highly technical enforcement of filing limitations [in civil rights complaints] is inconsistent with the statutory purpose of providing a remedial avenue for unrepresented claimants.").

On the other hand, it is perfectly appropriate to rely on a check-the-box rationale when there is otherwise no reasonable notice to the respondent and the civil rights agency of a particular charge. *See, e.g.,* *Hamzah v. Woodman's Food Mkt., Inc.*, 693 F. App'x 455, 458 (7th Cir. 2017) (finding failure to exhaust when the plaintiff claiming sexual orientation discrimination checked boxes for discrimination on the basis of race, retaliation, and age, but not for sex, and did not include any factual allegations related to sexual orientation in his narrative); *Johnson v. Pointe Coupee Parish Police Jury*, 261 F. App'x 668, 670 (5th Cir. 2008) (per curiam) (finding failure to exhaust on age discrimination claim when the plaintiff checked only the box for race discrimination, did not mention age discrimination in the EEOC charge narrative, or amend the EEOC charge to include age discrimination); *Ramon v. AT&T Broadband*, 195 F. App'x 860, 866 (11th Cir. 2006) (per curiam) (finding failure to exhaust on retaliation and hostile work environment claims when neither "could have reasonably been expected to grow [out] of the allegations made . . . in [the] EEOC charge"); *Marshall v. Fed. Express Corp.*, 130 F.3d 1095, 1098 (D.C. Cir. 1997) ("[A]llowing a complaint to encompass allegations outside the ambit of the predicate EEOC charge would circumvent the EEOC's investigatory and conciliatory role, as well as deprive the charged party of notice of the charge, as surely as would an initial failure to file a timely

EEOC charge." (quoting *Schnellbaecher v. Baskin Clothing Co.*, 887 F.2d 124, 127 (7th Cir. 1989))); *McElroy*, 703 N.W.2d at 390–91 (holding the plaintiff failed to exhaust her administrative remedies on her retaliation claim when she did not check the retaliation box on the complaint form, describe any retaliatory acts in her narrative, or provide the civil rights commission with any indication there was a retaliation issue); *Sw. Convenience Stores*, 560 S.W.3d at 401 ("A vague or circumscribed EEOC charge cannot satisfy the exhaustion requirement for claims it does not fairly embrace."). However, this is not such a hide the ball case because Hedlund's judicial age discrimination claim is related to and can be reasonably expected to grow out of the factual allegations made in support of his age discrimination charge in the ICRC complaint.

Because this is not a hide the ball type of case, because age discrimination was clearly identified as the type of illegality alleged, and because claims of termination and constructive discharge are related and intertwined, the defendants' check-the-box rationale lacks merit.

### III. Remedial Issues Under Iowa Code Section 70A.28(5).

This case involves remedial issues under Iowa Code section 70A.28(5). The first issue is whether Hedlund is entitled to a jury trial. The second issue is whether he is entitled to seek an award of emotional distress damages.

Iowa Code section 70A.28(5)(*a*) provides that a person who discharges an employee in violation of the statute

> [i]s liable to an aggrieved employee for affirmative relief including reinstatement, with or without back pay, or any other equitable relief the court deems appropriate, including attorney fees and costs.

I first consider whether Hedlund is entitled to a jury trial. We have recognized that, generally, there is no right to a jury trial in equity cases.

*Weltzin v. Nail*, 618 N.W.2d 293, 296 (Iowa 2000) (en banc). Thus, we must begin by determining whether Hedlund's section 70A.28(5)(*a*) claim is equitable or legal in nature.

"The legal or equitable nature of the proceeding is to be determined by the pleadings, the relief sought, and the nature of the case." *Carstens v. Cent. Nat'l Bank & Tr. Co. of Des Moines*, 461 N.W.2d 331, 333 (Iowa 1990). However, the fact that an action is commenced at law or in equity does not necessarily entitle or deprive a party of the right to a jury trial on the issues ordinarily triable to a jury. *Id.* Similarly, the mere fact that the relief sought is a legal remedy does not necessarily classify the action as a legal one. *Id.* Rather, we must "look at the essential nature of the cause of action" in addition to the pleadings and remedy. *Id.* Further, because the claim at issue here is a statutory one, we must also consider the statute's language.

Hedlund's case was commenced and docketed as an action at law. Notably, section 70A.28 does not specify whether the civil enforcement action in section 70A.28(5)(*a*) is a legal or equitable proceeding.

Hedlund also sought both legal and equitable relief. The ordinary rule, of course, is that legal remedies are to be determined by the jury while equitable remedies are determined by the court. *See, e.g.*, *Westco Agronomy Co. v. Wollesen*, 909 N.W.2d 212, 225 (Iowa 2017); *Weltzin v. Nail*, 618 N.W.2d 293, 296 (Iowa 2000); 1 Dan B. Dobbs, *Dobbs Law of Remedies* § 1.2, at 11 (2d ed. 1993) [hereinafter *Dobbs Law of Remedies*]; 47 Am. Jur. 2d *Jury* §§ 27, 28, Westlaw (database updated May 2019).

The statute expressly allows for "affirmative relief including reinstatement, with or without back pay," or any other appropriate equitable relief. Iowa Code § 70A.28(5)(*a*). This is an unusual statutory phrase. "Affirmative relief" is not usually considered presumptively legal

or equitable; rather, it is context dependent. *See, e.g.*, *Affirmative relief*, *Black's Law Dictionary* (10th ed. 2014) (defining *affirmative relief* as "[t]he relief sought by a defendant by raising a counterclaim or cross-claim that could have been maintained independently of the plaintiff's action"). Nevertheless, the term often corresponds with equitable forms of relief. *See, e.g.*, *Mlynarik v. Bergantzel*, 675 N.W.2d 584, 587–89 (Iowa 2004) (relying on equity principles to allow affirmative relief in the form of recovering attorney fees paid under an illegal contingent fee contract); *Opperman v. M. & I. Dehy, Inc.*, 644 N.W.2d 1, 7 (Iowa 2002) (characterizing as affirmative relief the cancelation of a real property mortgage and an award of attorney fees); *Allison v. Hess*, 28 Iowa 388, 390–91 (1869) (holding, in an equity action, the plaintiffs were not entitled to affirmative relief in the form of an injunction against the prosecution of a separate civil action by the defendant or a declaration that the real property lease at issue in the separate action was null and void); *Relief*, *Black's Law Dictionary* (placing *affirmative relief* under the third definition of *relief*, which is "[t]he redress or benefit, esp. equitable in nature (such as an injunction or specific performance), that a party asks of a court"). Use of the term *affirmative relief* suggests a section 70A.28(5)(*a*) action is an equitable one.

Also telling are the types of remedies expressly included in the affirmative relief available under section 70A.28(5)(*a*). Affirmative relief under the statute includes "reinstatement . . . or any *other* equitable relief." Iowa Code § 70A.28(5)(*a*) (emphasis added). Reinstatement, itself, is ordinarily an equitable remedy. *E.g.*, *Sayger v. Riceland Foods, Inc.*, 735 F.3d 1025, 1034–35 (8th Cir. 2013); 1 *Dobbs Law of Remedies* § 2.1(2), at 59–60 (noting reinstatement is a form of specific performance, which is a type of injunctive relief, which is a type of equitable remedy); 2 *Civil Actions*

*Against State and Local Government: Its Divisions, Agencies and Officers* § 14:16 (2d ed.), Westlaw STATCIVAC (database updated Feb. 2019) [hereinafter *Civil Actions*]. And the "any other equitable relief" language in section 70A.28(5)(*a*) indicates reinstatement is an equitable remedy for purposes of section 70A.28(5)(*a*). Section 70A.28(5)(*a*)'s express listing of only equitable remedies as types of affirmative relief suggests a section 70A.28(5)(*a*) claim is an equitable one.

However, it is not absolutely clear that section 70A.28(5)(*a*) limits affirmative relief to only equitable relief. First, nothing in the statute explicitly defines affirmative relief as equitable relief.

Second, section 70A.28(5)(*a*) provides that affirmative relief *includes* certain remedies, but the listed remedies do not appear to be an exhaustive list. This suggests affirmative relief could also include legal remedies. Section 70A.28(5)(*a*)'s explicit allowance of backpay, at first glance, seems to support that suggestion. Backpay has been repeatedly regarded as a legal remedy in a variety of employment law contexts. *See EEOC v. Baltimore County*, 904 F.3d 330, 332 (4th Cir. 2018) (per curiam) ("[B]ack pay is a mandatory, legal remedy under the [Fair Labor Standards Act] . . . ."), *cert. denied*, ___ S. Ct. ___, ___ (2019); *Santiago-Negron v. Castro-Davila*, 865 F.2d 431, 441 (1st Cir. 1989) ("[T]he determination of back pay as a factor of compensatory damages involves the substance of a common-law right to a trial by jury."); *Setser v. Novak Inv. Co.*, 638 F.2d 1137, 1142 (8th Cir.) ("[T]he remedy of backpay in [42 U.S.C.] § 1981 cases is more appropriately characterized as a compensatory, legal damage."), *vacated in part on other grounds and amended on reh'g by* 657 F.2d 962, 965 (8th Cir. 1981) (en banc); *Pons v. Lorillard*, 549 F.2d 950, 954 (4th Cir. 1977) ("[W]e believe that a monetary award for back wages is a traditional legal remedy and that the computation of such an award would not be

beyond the practical capabilities of a jury."), *aff'd on other grounds*, 434 U.S. 575, 585, 98 S. Ct. 866, 872 (1978). There is, however, at least a contrary view. *Broadnax v. City of New Haven*, 415 F.3d 265, 271 (2d Cir. 2005) (treating backpay, when a form of a lost wages award, as an equitable remedy in Title VII cases); *cf. Great-W. Life & Annuity Ins. v. Knudson*, 534 U.S. 204, 218 n.4, 122 S. Ct. 708, 717 n.4 (2002) (noting Congress treated backpay under Title VII, 42 U.S.C. § 2000e–5(g)(1), which has substantially similar language to Iowa Code section 70A.28(5)(*a*), as equitable "only in the narrow sense that it allowed backpay to be awarded *together with* equitable relief"). *See generally 2 Civil Actions* § 14.19 (stating that there is some disagreement whether backpay is a legal or equitable remedy). While not determinative, I note that in at least three recent Iowa cases, awards of backpay have been determined by juries. *See Hawkins*, ___ N.W.2d at ___ (noting the jury awarded backpay on ICRA claims for age and disability discrimination); *Lee v. State*, 815 N.W.2d 731, 735 (Iowa 2012) (noting the jury awarded backpay under the Family Medical Leave Act and the district court ordered reinstatement, frontpay, and attorney fees); *Vaughan*, 542 N.W.2d at 538 (noting the jury awarded backpay under the Federal ADEA).

Here, however, the award of backpay in the statute appears to be linked to the equitable remedy of reinstatement. *Cf. Great-W. Life & Annuity Ins.*, 534 U.S. at 218 n.4, 122 S. Ct. at 717 n.4. When reinstatement is ordered by the court, backpay may or may not be awarded. How would a jury decide this question? It would seem odd to have the court determine whether or not reinstatement is appropriate but then allow the jury to decide the amount of backpay arising from the reinstatement.

Further, if the court sitting in equity determines that reinstatement is not appropriate, can the employee receive backpay as "other equitable relief"? Iowa Code § 70A.28(5)(*a*). It would also seem odd for a statute to allow backpay only if the court elects to reinstate the employee but deny it where reinstatement was thought to be impractical or undesirable. In other words, if we were to characterize backpay in the context of this statute as legal relief, it would become unavailable under the statute if reinstatement is not granted.[20]

Moreover, frontpay serves as an alternative "other equitable relief" to reinstatement, and it is often awarded in addition to backpay. *See, e.g.*, *Van Meter Indus.*, 675 N.W.2d at 513–15 & n.5 (calculating both frontpay and backpay in employment discrimination case); 2 *Dobbs Law of Remedies* § 6.10(4), at 205, 213–15 ("[Under federal statutes that are substantially similar to section 70A.28(5)(*a*), w]hen reinstatement is permitted under the statute, but denied for reasons peculiar to the individual claim, 'front pay' or an award for future lost pay may be given in lieu of reinstatement. . . . When reinstatement is not a suitable remedy on the facts, a money remedy for future economic losses must be constructed if possible."). As there is no usual, corresponding "other equitable relief" alternative to backpay, it makes sense for backpay to be treated as equitable under the statute and available regardless of whether the employee is reinstated or, alternatively, awarded frontpay.

---

[20]Such a result would be troubling especially in light of the fact that reinstatement is disfavored as a remedy in the employment context. *See* Restatement of Employment Law § 9.04 & cmts. *b–c*, at 523–24 (Am. Law Inst. 2015); 2 *Dobbs Law of Remedies* § 6.10(2), at 198; 3 *id.* § 12.21(4), at 489; *see also Lee v. State*, 844 N.W.2d 668, 671 (Iowa 2014) (noting concern regarding the propriety of reinstatement in an employment context); Restatement (Second) of Contracts § 367(1), at 192 (Am. Law Inst. 1981). *See generally* Restatement of Employment Law § 9.04 cmt. *b*, at 523–24 (providing rationale for rule against specific performance); Restatement (Second) of Contracts § 367 cmt. *a*, at 192 (same); 3 *Dobbs Law of Remedies* § 12.21(4), at 489–93 (same).

So the question is how to interpret this statute in a way that is coherent. As a general matter, I think backpay, which seems to be a type of damages, is ordinarily a legal remedy. But we must be sensitive to the statutory environment in which the term has been planted. In the case of this statute, I believe that backpay is available whether or not reinstatement occurs. For purposes of this statute, and this statute only, I conclude that the remedy of backpay should be treated as an equitable remedy.

Even so, there are practical reasons that the legislature expressly enumerated certain equitable remedies but not legal remedies in section 70A.28(5)(*a*). First, it must be remembered that section 70A.28 is applicable in the employment law context. A section 70A.28(5)(*a*) action to enforce the dictates of section 70A.28(2), which prohibit, in part, discharging an employee for engaging in a protected activity, is akin to the tort action of wrongful discharge in violation of public policy. *See, e.g.,* Restatement of Employment Law § 7.07, at 375 (Am. Law Inst. 2015); 2 *Dobbs Law of Remedies* § 6.10(3), at 201. But in the employment law context, there is a traditional rule against the remedy of specific performance, especially in the form of reinstatement. *See* Restatement of Employment Law § 9.04 & cmts. *b–c*, at 523–24; 2 *Dobbs Law of Remedies* § 6.10(2), at 198; 3 *id.* § 12.21(4), at 489; *see also Lee v. State*, 844 N.W.2d 668, 671 (Iowa 2014) (noting concern regarding the propriety of reinstatement in an employment context); Restatement (Second) of Contracts § 367(1), at 192 (Am. Law Inst. 1981). *See generally* Restatement of Employment Law § 9.04 cmt. *b,* at 523–24 (providing rationale for rule against specific performance); Restatement (Second) of Contracts § 367 cmt. *a,* at 192 (same); 3 *Dobbs Law of Remedies* § 12.21(4), at 489–93 (same). Thus, if the legislature wanted

reinstatement to be an available remedy for a wrongful discharge under section 70A.28(2), it needed to specifically state as much, which it did in section 70A.28(5)(*a*).

Second, a similar rationale explains the express enumeration of the equitable remedies of attorney fees and costs in section 70A.28(5)(*a*). Under the American rule, ordinarily each party is responsible for its own attorney fees and costs. *De Stefano v. Apts. Downtown, Inc.*, 879 N.W.2d 155, 168 (Iowa 2016). There is an exception to that rule, however, where a statute expressly authorizes an award of attorney fees. *See Lee v. State*, 906 N.W.2d 186, 197 (Iowa 2018). Thus, if the legislature wanted to ensure persons harmed by a violation of section 70A.28(2) were able to recover attorney fees and costs in a section 70A.28(5)(*a*) action, it needed to so state. It did so in section 70A.28(5)(*a*).

Third, the legislature's express inclusion of the "any other equitable relief" language in section 70A.28(5)(*a*), likewise, is necessary in light of the specific relief listed in section 70A.28(5)(*b*), which provides,

> When a person commits, is committing, or proposes to commit an act in violation of subsection 2, an injunction may be granted through an action in district court to prohibit the person from continuing such acts. The action for injunctive relief may be brought by an aggrieved employee or the attorney general.

As an injunction is a form of equitable relief, relief from a discharge in violation of subsection (2) pursuant to subsection (5)(*b*) can be only equitable relief. Therefore, if the legislature wanted subsection (5)(*a*) to allow for equitable relief, generally, or specific kinds of equitable relief, it needed to say so. It did this by expressly including specific kinds of equitable relief and equitable relief generally as types of affirmative relief available under subsection (5)(*a*).

In sum, these practical explanations for the language used in section 70A.28(5)(*a*) suggest affirmative relief under section 70A.28(5)(*a*) can include equitable and legal remedies. Nevertheless, the remedy sought or available is not the sole factor we must consider; we must also consider the essential nature of the action. *See Weltzin*, 618 N.W.2d at 297 ("[I]t is the nature of the cause of action, *i.e.*, where the case is properly docketed, that is the deciding factor."); *Carstens*, 461 N.W.2d at 333 ("We look at the essential nature of the cause of action, rather than solely at the remedy, to determine if a party is entitled to a jury trial.").

The essential nature of Hedlund's section 70A.28(5)(*a*) claim is analogous to a wrongful discharge in violation of public policy claim.[21] *See, e.g.*, 2 *Dobbs Law of Remedies* § 6.10(3), at 201 (treating causes of action that arise from the violation of statutes prohibiting retaliatory discharge for whistleblowing as equivalent to common law wrongful discharge in violation of public policy claims); *see also Jasper v. H. Nizam, Inc.*, 764 N.W.2d 751, 762 (Iowa 2009). In *Jasper*, we acknowledged that "our wrongful-discharge cases that have found a violation of public policy can generally be aligned into four categories of statutorily protected activities," which include "exercising a statutory right or privilege," such as the right to file a workers' compensation claim or pursue unemployment benefits, and reporting the employer's illegal or publically harmful activities. 764 N.W.2d at 762; *see* Vanessa F. Kuhlmann-Macro, Note,

---

[21]Under Iowa law, the elements of a wrongful discharge in violation of public policy tort are

> (1) existence of a clearly defined public policy that protects employee activity; (2) the public policy would be jeopardized by the discharge from employment; (3) the employee engaged in the protected activity, and this conduct was the reason for the employee's discharge; and (4) there was no overriding business justification for the termination.

*Jasper v. H. Nizam, Inc.*, 764 N.W.2d 751, 761 (Iowa 2009).

*Blowing the Whistle on the Employment At-Will Doctrine*, 41 Drake L. Rev. 339, 341–42 (1992), cited by *Jasper*, 764 N.W.2d at 762.

A state employee has an implied statutory right to whistleblow within the parameters of section 70A.28(2). Thus, if the employee exercises that right and is discharged as a result, which constitutes a violation of section 70A.28(2), the employer's violation likely gives rise to a wrongful discharge in violation of public policy tort action.

Accordingly, so long as a section 70A.28(5)(*a*) claim does not preempt or otherwise preclude such a wrongful discharge in violation of public policy claim, the relief afforded by and the nature of a section 70A.28(5)(*a*) proceeding should be interpreted as being equitable. As nothing in the Iowa Code or our caselaw indicates the relief afforded in section 70A.28(5) preempts relief from other common law avenues of redress, I conclude Hedlund's section 70A.28(5)(*a*) claim is equitable in nature. *But cf.* Restatement of Employment Law § 5.01 & cmt. *e* & illust. 3, at 188, 190–92 (noting some states have found the remedies of reinstatement and backpay in their whistleblower statutes to be completely preemptive). Therefore, Hedlund is not entitled to a jury trial on his section 70A.28(5)(*a*) claim.

I now turn to the question of emotional distress damages. The statute does not specifically state that damages for emotion distress may be recovered. Yet, the statute allows for affirmative relief. However, as indicated above, the nature of a section 70A.28(5)(*a*) proceeding should be interpreted as being equitable. Thus, I conclude that the statute authorizes only equitable relief. Emotional distress damages are not equitable relief, and under my approach, they are not available under the statute.

**IV. Conclusion.**

For the above reasons, I concur in the majority's conclusion that Hedlund is not entitled to a jury trial or emotional distress damages on his section 70A.28(5)(*a*) whistleblower claim.  I respectfully dissent from the dismissal of the age discrimination claim in this case.

Cady, C.J., and Wiggins, J., join this concurrence in part and dissent in part.